In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-3047

BACKPAGE.COM, LLC,

*Plaintiff-Appellant*,

*v.*

THOMAS J. DART, Sheriff of Cook County, Illinois,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15 C 6340 — **John J. Tharp, Jr.**, *Judge*.

ARGUED NOVEMBER 13, 2015— DECIDED NOVEMBER 30, 2015

Before POSNER, RIPPLE, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. Backpage.com (we'll call it just Backpage) provides an online forum for classified ads sectioned by subject matter, such as rentals, real estate, jobs, and, among still others, "adult." The adult section in turn is subdivided into escorts, body rubs, strippers and strip clubs, dom[ination] and fetish, ts (transsexual escorts), male escorts, phone [sex], and adult jobs (jobs related to services of-

fered in other adult categories, whether or not the jobs are sexual—not every employee of a brothel is a sex worker).

The Sheriff of Cook County, Tom Dart, has embarked on a campaign intended to crush Backpage's adult section— crush Backpage, period, it seems—by demanding that firms such as Visa and MasterCard prohibit the use of their credit cards to purchase any ads on Backpage, since the ads might be for illegal sex-related products or services, such as prostitution. Visa and MasterCard bowed to pressure from Sheriff Dart and others by refusing to process transactions in which their credit cards are used to purchase *any* ads on Backpage, even those that advertise indisputably legal activities.

Backpage sought a preliminary injunction to stop the sheriff's campaign of starving the company by pressuring credit card companies to cut ties with its website. The district court denied the injunction and Backpage has appealed, contending that the sheriff is curtailing freedom of expression, in violation of the First Amendment. The sheriff ripostes that he's not using his office to organize a boycott of Backpage by threatening legal sanctions, but merely expressing his disgust with Backpage's sex-related ads and the illegal activities that they facilitate. That's not true, and while he has a First Amendment right to express his views about Backpage, a public official who tries to shut down an avenue of expression of ideas and opinions through "actual or threatened imposition of government power or sanction" is violating the First Amendment. *American Family Association, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002).

The difference between government expression and intimidation—the first permitted by the First Amendment, the

latter forbidden by it—is well explained in *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (per curiam): "the fact that a public-official defendant lacks direct regulatory or decisionmaking authority over a plaintiff, or a third party that is publishing or otherwise disseminating the plaintiff's message, is not necessarily dispositive … . What matters is the distinction between attempts to convince and attempts to coerce. A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form." Notice that such a threat is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent. But the victims in this case yielded to the threat.

It may seem odd, though it certainly does not exonerate Sheriff Dart, that he should be going after the credit-card companies rather than after Backpage itself. If Backpage is violating the law by accepting classified ads for "adult" services, which may include illegal services, such as prostitution, you'd think the sheriff would sue Backpage. But no; he tried that against Craigslist, a classified-ads website that had an adult section similar to Backpage's, and he failed. District Judge Grady, in a thorough opinion, threw out the sheriff's case. *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D. Ill. 2009). Craigslist, perhaps anticipating Dart's campaign against Backpage, shut down its adult section the following year, though adult ads can be found elsewhere on its website.

The suit against Craigslist having failed, the sheriff decided to proceed against Backpage not by litigation but instead by suffocation, depriving the company of ad revenues by scaring off its payments-service providers. The analogy is to killing a person by cutting off his oxygen supply rather than by shooting him. Still, if all the sheriff were doing to crush Backpage was done in his capacity as a private citizen rather than as a government official (and a powerful government official at that), he would be within his rights. But he is using the power of his office to threaten legal sanctions against the credit-card companies for facilitating future speech, and by doing so he is violating the First Amendment unless there is *no* constitutionally protected speech in the ads on Backpage's website—and no one is claiming that. The First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is compliance with his demands. E.g., *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64–72 (1963); *Okwedy v. Molinari*, *supra*, 333 F.3d at 342–44; *American Family Association, Inc. v. City & County of San Francisco*, *supra*, 277 F.3d at 1125.

Central to Backpage's case is a letter of June 29 of this year that Sheriff Dart sent both to MasterCard's CEO and Board of Directors and to the corresponding personnel of Visa. The letter is on stationery captioned "Office of the Sheriff," and begins: "As the Sheriff of Cook County, a father and a caring citizen, I write to request that your institution immediately cease and desist from allowing your credit cards to be used to place ads on websites like Backpage.com." Notice that he is sheriff first, father and citizen second; notice his use of the legal term "cease and desist"; notice that he calls MasterCard "your institution," implying

that the same letter is going to other "institutions"—namely other credit card companies—in other words that he is organizing a boycott. And notice that he doesn't demand that "your institution" refuse to allow "your credit cards" to be used to pay *just* for ads on Backpage's website that promote illegal products or services—he demands that "your institution" cease and desist from placing *any* ads "on websites like Backpage.com" (and *a fortiori* on Backpage's own website) even though "adult" ads are only one of eleven types of classified ad published on the website. Visa and MasterCard got the message and cut *all* their ties to Backpage.

The letter goes on to state that "it has become increasingly indefensible for any corporation to continue to willfully play a central role in an industry that reaps its cash from the victimization of women and girls across the world." The implication, given whom the letter is addressed to, is that credit card companies, such as MasterCard and Visa, "*willfully* play a *central* role" in a criminal activity (emphases added)—so they had better stop! Indeed, the letter goes on to say, those companies are "key" to the "growth" of sex trafficking in the United States. (Actually, as explained in an amicus curiae brief filed by the Cato Institute, Reason Foundation, and DKT Liberty Project, citing voluminous governmental and academic studies, there are no reliable statistics on which Sheriff Dart could base a judgment that sex trafficking has been increasing in the United States.) He is intimating that two of the world's largest credit card companies may be criminal accomplices.

"Financial institutions," the letter continues, "have the legal duty to file 'Suspicious Activity Reports' to authorities in cases of human trafficking and sexual exploitation of mi-

nors." The letter cites the federal money-laundering statute, 18 U.S.C. § 1956, thereby intimating that the credit card companies could be prosecuted for processing payments made by purchasers of the ads on Backpage that promote unlawful sexual activity, such as prostitution. And "make no mistake," the letter thunders: "Your [credit] cards have and will continue to be used to buy ads that sell children for sex on sites like Backpage.com. … The use of credit cards in this violent industry implies an undeserved credibility and sense of normalcy to such illicit transactions and only serves to increase demand."

And here's the kicker: "Within the next week, please provide me with contact information for an individual within your organization that I can work with [harass, pester] on this issue." The "I" is Sheriff Dart, not private citizen Dart—the letter was signed by "Thomas Dart, Cook County Sheriff." And the letter was not merely an expression of Sheriff Dart's opinion. It was designed to compel the credit card companies to act by inserting Dart into the discussion; he'll be chatting them up. Further insight into the purpose and likely effect of such a letter is provided by a strategy memo written by a member of the sheriff's staff in advance of the letter. The memo suggested approaching the credit card companies (whether by phone, mail, email, or a visit in person) with threats in the form of "reminders" of "their own potential liability for allowing suspected illegal transactions to continue to take place" and their potential susceptibility to "money laundering prosecutions … and/or hefty fines." Allusion to that "susceptibility" was the culminating and most ominous threat in the letter.

Upon receipt of the letter MasterCard forthwith stopped allowing its credit cards to be used to purchase ads anywhere on Backpage's website. Visa followed suit. So the threats had worked. And so just two days after Dart's letter was sent, the Cook County Sheriff's Office was able to (and did) issue a triumphant press release captioned "Sheriff Dart's Demand to Defund Sex Trafficking Compels Visa and MasterCard to Sever Ties with Backpage.com." Notice "demand," not request; notice "compels," not persuades; notice "sever ties," not "refuse to make payments for ads in the adult section of the Backpage website."

Imagine a letter that was similar to Sheriff Dart's but more temperate (no "demand," no "compels," no "sever [all] ties") and sent to a credit card company by a person who was not a law-enforcement officer. The letter would be more likely to be discarded or filed away than to be acted on. For there is evidence that the credit card companies had received such complaints from private citizens, yet it was Dart's letter that spurred them to take immediate action to cut off Backpage. For that was a letter from a government official containing legal threats and demands for quick action and insisting that an employee of the recipient be designated to answer phone calls or respond to other communications from the sheriff. It was within days of receiving the letter that the credit card companies broke with Backpage. The causality is obvious.

It's true that Visa filed an affidavit stating that "at no point did Visa perceive Sheriff Dart to be threatening Visa." But what would one expect an executive of Visa to say? "I am afraid of the guy?" "He is in effect calling me an accomplice of a criminal organization (Backpage), and I'm afraid

he might pull strings to get me investigated and even prose-cuted by any one of several federal or state agencies?" More significant than Visa's denial of having succumbed to Sheriff Dart's pressure tactics is the statement in the affidavit that the withdrawal of credit card services from Backpage "fol-low[ed] communication with Sheriff Dart's staff" and with "Visa Legal Department" personnel. The reference was to those follow-up communications from the sheriff's office promised (which is to say threatened) in the letters to Visa and MasterCard. The promise/threat was honored. The day after Dart sent the letter, his Director of Communications emailed Visa that he "wanted to give fair warning that we will be having a press conference tomorrow morning … . Obviously the tone of the press conference will change con-siderably if your executives see fit to sever ties with Back-page and its imitators. Of course we would need to know tonight if that is the case so that we can ensure the Sheriff's messaging celebrates Visa's change in direction *as opposed to pointing out its ties to sex trafficking*" (emphasis added). In an ensuing exchange of messages between two Visa employees, one said: "Yes, love the subtle messages they've been send-ing us that could easily be taken for blackmail." To which the other replied that he'd told the boss of the Director of Communications "that he needs to tone down the threaten-ing language … all of his emails as a public employee are, of course, discoverable and public, if anyone asks for them … . Sigh." Visa understood that Sheriff Dart's letter and the fol-low-up by his Director of Communications were serious threats and therefore had to be taken seriously.

Visa and MasterCard were victims of government coer-cion aimed at shutting up or shutting down Backpage's adult section (more likely aimed at bankrupting Backpage—

lest the ads that the sheriff doesn't like simply migrate to other sections of the website), when it is unclear that Backpage is engaged in illegal activity, and if it is not then the credit card companies cannot be accomplices and should not be threatened as accomplices by the sheriff and his staff. Section 230(c) of the Communications Decency Act of 1996 states, as Judge Grady had noted in the *Craigslist* case, that "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1); see *Dart v. Craigslist, Inc.*, *supra*, 665 F. Supp. 2d at 965–69. As our court has explained, interpreting section 230(c), "an intermediary … normally is indifferent to the content of what it transmits. Even entities that know the information's content do not become liable for the sponsor's deeds. Does a newspaper that carries an advertisement for 'escort services' or 'massage parlors' aid and abet the crime of prostitution, if it turns out that some (or many) of the advertisers make money from that activity?" *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003); see also *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 670 (7th Cir. 2008). Sounds like our case. Backpage is an intermediary between the advertisers of adult services and visitors to Backpage's website. The credit card companies are more remote intermediaries.

It's true that the Communications Decency Act does not immunize the credit card companies or Backpage from federal criminal liability, 47 U.S.C. § 230(e)(1), and remember that in the June letter Dart made ominous reference to the federal money-laundering statute. It's unlikely that credit card companies would be prosecuted as aiders and abettors of Backpage, any more than the landlord of premises occu-

pied by Backpage would be; but obviously credit card companies don't like being threatened by a law-enforcement official that he will sic the feds on them, even if the threat may be empty. At oral argument Dart's attorney reminded us that "nowhere in Sheriff Dart's letter does it say that he thought that they [the credit card companies] were accomplices to a crime." But the letter implies that they are—and it was the letter that prompted the credit card companies to abandon Backpage. They are unlikely to reconsider on the basis of a lawyer's statement at oral argument, months after the initial threat.

Nor is Sheriff Dart on solid ground in suggesting that *everything* in the adult section of Backpage's website is criminal, violent, or exploitive. Fetishism? Phone sex? Performances by striptease artists? (Vulgar is not violent.) One ad in the category "dom & fetish" is for the services of a "professional dominatrix"—a woman who is paid to whip or otherwise humiliate a customer in order to arouse him sexually. See *What It's Actually Like Being A Dominatrix (According To One Dominatrix)*, www.xojane.com/sex/what-its-actually-like-being-a-dominatrix-according-to-one-dominatrix (visited November 27, 2015) ("I make a living as a professional dominatrix. … I make a living by hitting, humiliating, dressing up, verbally attacking and otherwise fulfilling men's weird fantasies about being dominated."); see also *Wikipedia*, "Dominatrix," https://en.wikipedia.org/wiki/Dominatrix (visited the same day). It's not obvious that such conduct endangers women or children or violates any laws, including laws against prostitution.

The district judge remarked "that the majority of the advertisements [in Backpage's adult section] are for sex"—but

a majority is not all, and not all advertisements for sex are advertisements for illegal sex. There is no estimate of how many ads in Backpage's adult section promote illegal activity; we just gave examples of some that do not.

As a citizen or father, or in any other private capacity, Sheriff Dart can denounce Backpage to his heart's content. He is in good company; many people are disturbed or revolted by the kind of sex ads found on Backpage's website. And even in his official capacity the sheriff can express his distaste for Backpage and its look-alikes; that is, he can exercise what is called "[freedom of] government speech." See *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015); *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009); *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005); *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 833–34 (1995); *Freedom from Religion Foundation, Inc. v. Obama*, 641 F.3d 803 (7th Cir. 2011). A government entity, including therefore the Cook County Sheriff's Office, is entitled to say what it wants to say—but only within limits. It is not permitted to employ threats to squelch the free speech of private citizens. "[A] government's ability to express itself is [not] without restriction. … [T]he Free Speech Clause itself may constrain the government's speech." *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, *supra*, 135 S. Ct. at 2246; see also *Rosenberger v. Rector & Visitors of the University of Virginia*, *supra*, 515 U.S. at 833–34.

In his public capacity as a sheriff of a major county (Cook County has a population of more than 5.2 million), Sheriff Dart is not permitted to issue and publicize dire threats against credit card companies that process payments made through Backpage's website, including threats of prosecu-

tion (albeit not by him, but by other enforcement agencies that he urges to proceed against them), in an effort to throttle Backpage. See *Bantam Books, Inc. v. Sullivan*, *supra*, 372 U.S. at 67. For where would such official bullying end, were it permitted to begin? Some public officials doubtless disapprove of bars, or pets and therefore pet supplies, or yard sales, or lawyers, or "plug the band" (a listing of music performances that includes such dubious offerings as "SUPERCELL Rocks Halloween at The Matchbox Bar & Grill"), or men dating men or women dating women—but ads for all these things can be found in non-adult sections of Backpage and it would be a clear abuse of power for public officials to try to eliminate them not by expressing an opinion but by threatening credit card companies or other suppliers of payment services utilized by customers of Backpage, or other third parties, with legal or other coercive governmental action.

With very limited exceptions, none applicable to this case, censorship—"an effort by administrative methods to prevent the dissemination of ideas or opinions thought dangerous or offensive," *Blue Canary Corp. v. City of Milwaukee*, 251 F.3d 1121, 1123 (7th Cir. 2001), as distinct from punishing such dissemination (if it falls into one of the categories of punishable speech, such as defamation or threats) after it has occurred—is prohibited by the First Amendment as it has been understood by the courts. "Threatening penalties for future speech goes by the name of 'prior restraint,' and a prior restraint is the quintessential first-amendment violation." *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009). The Supreme Court, in enjoining a state commission from sending threatening letters to distributors of books that the commission deemed obscene, found that the "notices, phrased virtually as orders, reasonably understood to be

such by the distributor, invariably followed up by police visitations, in fact stopped the circulation of the listed publications." *Bantam Books, Inc. v. Sullivan*, *supra*, 372 U.S. at 68. The court held the state's "system of informal censorship" unconstitutional, pointing out that "though the Commission is limited to informal sanctions—the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation—the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim." *Id*. at 67. The distributor of the plaintiffs' books, corresponding to the credit card companies in this case, received first from the Commission a written request for "cooperation" and then "follow up" visits from police, corresponding to the follow-up calls promised in Sheriff Dart's letter. *Id.* at 63, 68. The distributor bowed to the Commission's demand "rather than face the possibility of some sort of a court action against ourselves, as well as the people that we supply." *Id* at 63. That is like this case, yet the district court denied Backpage's motion for a preliminary injunction that would have required Sheriff Dart to desist from attempting to intimidate, by threatening legal action against, companies that provide payment services to customers of Backpage.

It might seem that large companies such as Visa and MasterCard would not knuckle under to a sheriff, even the sheriff of a very populous county. That might be true if they derived a very large part of their income from the company that he wanted them to boycott. But they don't. Backpage's monthly revenue from "adult" ads was recently estimated at $9 million and its total revenue in 2014 at $135 million, whereas the combined net revenue of MasterCard and Visa in that year exceeded $22 billion. The revenue they derived

from Backpage's adult ads must have been a small fraction of their overall revenue, especially since not all of Backpage's ad customers pay for their ads with a MasterCard or Visa credit card. Yet the potential cost to the credit card companies of criminal or civil liability and of negative press had the companies ignored Sheriff Dart's threats may well have been very high, which would explain their knuckling under to the threats with such alacrity.

The district court's opinion denying the relief sought by Backpage contains a number of errors. It states, for example, that the Supreme Court in the *Bantam Books* case "was careful to note [at 372 U.S. at 71–72 that] its ruling does not require law enforcement officials to 'renounce all informal contacts with persons suspected of violating valid laws prohibiting obscenity.'" This doesn't help Dart's case; he didn't just make informal contacts with credit card companies; Backpage is complaining about the formal contacts that he initiated with those companies in an effort to frighten them into severing their contracts with Backpage.

In tension with his holding, Judge Tharp's opinion contains a lucid, indeed compelling, explanation of why Sheriff Dart's letter to MasterCard *did* constitute a threat:

> Dart's letter to the credit card companies could reasonably be interpreted as an implied threat to take, or cause to be taken, some official action against the companies if they declined his "request" to stop providing a method to pay for advertising on Backpage.com. Dart did not directly threaten the companies with an investigation or prosecution, and he admits that his department had no authority to take any official action with respect to Visa and MasterCard. But by writing in his official capacity, requesting a "cease and desist," invoking the legal obligations of finan

cial institutions to cooperate with law enforcement, and requiring ongoing contact with the companies, among other things, Dart could reasonably be seen as implying that the companies would face some government sanction—specifically, investigation and prosecution—if they did not comply with his "request." This is true even if the companies understood the jurisdictional constraints on Dart's ability to proceed against them directly. As Dart admitted in the preliminary injunction hearing, his department often coordinates with other local law enforcement agencies and sometimes with other states and the federal government. There is no reason that he could not refer the credit card companies to the appropriate authority to investigate their suspected role in facilitating human trafficking. … And further, in this very case, Dart contacted the Inspector General of the United States Postal Service and the FBI, urging them to investigate the lawfulness of alternative payment methods for Backpage's sex ads.

Furthermore, Dart's pre- and post-letter statements are consistent with (though not conclusive proof of) an attempt at official coercion. The strategy memorandum expressly recommended appealing to the credit card companies' interest in avoiding liability and it cannot be credibly argued that the references to the federal money laundering statute and other regulations defining duties of financial institutions were not intended to suggest that the companies could face civil or criminal liability for facilitating payments for unlawful ads placed on Backpage.com … . And after the letters were sent, Dart's office was happy to take credit for "compelling" the companies' actions. Dart referred to his letter not as a "request" but as a "demand." A "demand" is consistent with his role as sheriff, but not [with his role as] "a father and a caring citizen." Finally, the urgency of the sheriff's department's follow-up communications imposed another layer of coercion due to its

strong suggestion that the companies could not simply ignore Dart.

Yet having thus shown that Sheriff Dart had indeed used his office as sheriff to intimidate the credit card companies, Judge Tharp said that "a threat alone is not a prior restraint. … [T]he threat must produce some 'consequence.' … And while the Court [that is, Judge Tharp] does not quarrel with the premise that the *letter* precipitated the companies' actions … it is far from clear that any *threat* the letter may have contained caused the companies' action" (emphases in original). Maybe, the judge suggested, the letter and other threatening actions taken by Sheriff Dart and his underlings merely reminded the credit card companies that they "simply did not want to do business with a website where advertisers peddle flesh." And therefore, the judge concluded, Backpage has a "small likelihood of success on the merits" of its suit against the sheriff.

Had the companies not known that "advertisers peddle flesh" on Backpage, the judge's point would have been well taken. But of course they knew about the nature of the advertising on Backpage—everyone does—without having to be told by Sheriff Dart. He didn't educate them about the nature and possible consequences of advertising for sex; he told them to desist or else. If Judge Tharp had been correct in crediting the companies with "ceas[ing] doing business with Backpage.com because they did not want their products to be associated with the content posted there," they would have ceased doing business with it years before. Backpage's content was not a discovery of Sheriff Dart's. If as the judge said the credit card companies cut off Backpage "for independent business reasons," why hadn't they done that years

earlier? The internal email exchanges of both Visa and MasterCard support our doubts on this point; recall for example the use of the term "blackmail" in the exchange between Visa employees.

Unwittingly the judge was suggesting a formula for permitting unauthorized, unregulated, foolproof, lawless government coercion. The formula consists of coupling threats with denunciations of the activity that the official wants stamped out, for the target of the denunciation will be reluctant to acknowledge that he is submitting to threats but will instead ascribe his abandonment of the activity to his having discovered that it offends his moral principles. The judge was giving official coercion a free pass because it came clothed in what in the absence of any threatening language would have been a permissible attempt at mere persuasion. See, e.g., *Bantam Books, Inc. v. Sullivan*, *supra*, 372 U.S. at 66–67; *American Civil Liberties Union v. City of Pittsburgh*, 586 F. Supp. 417, 421–23 (W.D. Pa. 1984).

The judge was further mistaken when he said that "the Sheriff's own First Amendment rights are at stake in this case and the Court must therefore also consider the risk that erroneously entering an injunction would chill Dart's own right to speak out on issues of public concern. Sheriff Dart has a First Amendment right to publicly criticize the credit card companies for any connection to illegal activity, *as long as he stops short of threats*" (emphasis added). But the judge himself, in the passages we quoted earlier, had been emphatic that Dart had *not* stopped short of threats. Those threats were not protected by the First Amendment; they were violations of the First Amendment.

And when, finally, the judge denied that there was evidence that Backpage had been irreparably harmed by its abandonment by the credit card companies, he again contradicted himself, having noted that in response to that abandonment "Backpage made its ads free … and no company can expect to continue to operate without a source of revenue." The judge had no basis for conjecturing as he did that Backpage could avoid that fate by offsetting the loss of the credit card companies by arranging payments by its customers through Bitcoin, checks, money orders, or cash. It was a weak conjecture, as he quickly acknowledged, saying that "whether the financial losses that Backpage sustains while grappling with the withdrawal of credit card processors will result in Backpage's demise has not yet been established"—but immediately adding: "that may well be the result"!

Indeed it may. But even short of that, Sheriff Dart's campaign of suffocation would be bound to cause irreparable injury to Backpage, and irreparable injury is the essential condition of preliminary relief, *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386–87 (7th Cir. 1984), which is all that is at stake in this appeal. It was Sheriff Dart's intention to harm Backpage irreparably; in an email to members of the press his Director of Communications stated that Backpage had made its adult ads free in response to the credit card companies' decision not to allow their credit cards to be used to pay for ads on Backpage's website, but continued: "We were ready for this and not concerned. It's unsustainable for them to maintain all of their lobbying, legal battles and all the money it takes for their server space without any revenue coming in." In other words, Backpage is doomed. That sounds like irreparable harm to us; nor is

there an offsetting harm of a kind cognizable by the courts from enjoining the sheriff from violating the First Amendment.

Turning finally to the issue of remedy: Had Sheriff Dart sued Backpage seeking to enjoin its publication of sex-related ads, the company's remedy would have been to seek a judgment dismissing the suit. But Backpage is the plaintiff, and its only remedy is an injunction against the sheriff's violating its First Amendment rights. As in *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976), "it is clear … that First Amendment interests were either threatened or in fact being impaired at the time relief was sought. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. Since such injury was both threatened and occurring at the time of respondents' motion and since respondents sufficiently demonstrated a probability of success on the merits, the Court of Appeals might properly have held that the District Court abused its discretion in denying preliminary injunctive relief." And so it is here; given the strength of Backpage's case, the district judge erred in denying its motion for a preliminary injunction, and we therefore reverse the judge's ruling with directions that he issue the following injunction (which supersedes the temporary injunction, pending decision of the appeal, issued by this court on November 16):

> Sheriff Dart, his office, and all employees, agents, or others who are acting or have acted for or on behalf of him, shall take no actions, formal or informal, to coerce or threaten credit card companies, processors, financial institutions, or other third parties with sanctions intended to ban credit card or other financial services from being provided to Backpage.com.

Sheriff Dart shall immediately upon receipt of this order transmit a copy electronically to Visa and MasterCard and all other recipients of his June 29, 2015, letter (including therefore the directors of and investors in Visa and MasterCard), as well as to the Chief Inspector of the United States Postal Service.

Backpage.com shall not be required to post a security bond.

REVERSED AND REMANDED, WITH DIRECTIONS