In the

# United States Court of Appeals
### For the Seventh Circuit

_____

No. 15-3818

BLACK EARTH MEAT MARKET, LLC, *et al.*,

*Plaintiffs-Appellants*,

*v.*

VILLAGE OF BLACK EARTH, *et al.*,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:14-cv-00674-bbc — **Barbara B. Crabb**, *Judge*.

_____

ARGUED JUNE 1, 2016 — DECIDED AUGUST 24, 2016

_____

Before WOOD, *Chief Judge*, and BAUER and FLAUM, *Circuit Judges*.

WOOD, *Chief Judge*. Roughly 90 miles west of Milwaukee lies the small town of Black Earth, Wisconsin. For years, a butcher shop operated on the plot located at 1345 Mills Street. While the property is not zoned for slaughtering livestock, the activity had long been permitted as a legal nonconforming use. In 2001, Black Earth Meats (BEM) purchased the property. Sometime after 2009, the volume and frequency of

slaughter increased. By 2011, neighbors were complaining about increased traffic, delivery trucks blocking the road, livestock noise, foul odors, improper storage of animal parts, and the presence of offal, blood, and animal waste in the streets. Steers escaped from the facility on three occasions; each time, a posse had to hunt the fugitive bovine through the streets of Black Earth and, ultimately, shoot it dead.

In 2013, the Village trustees decided to do something about the renegade slaughterhouse. It increased enforcement of Village regulations, ordered BEM to propose an acceptable plan for relocating its slaughter activities, held several public meetings, and in July 2014, threatened litigation. As a result of the Village's threat of litigation, the U.S. Department of Agriculture (USDA) refused to guarantee a loan to BEM from the Bank of New Glarus. Shortly afterwards, BEM lost its financing, closed, and then sued the Village and the members of its Board. The district court granted summary judgment to the defendants. BEM appeals, and we affirm.

**I**

In 2001, Black Earth Meats purchased the property located at 1345 Mills Street, in the Village of Black Earth, Wisconsin. For the previous 60 years, the plot had been used as a slaughterhouse and retail butcher shop. While the land was zoned as "B-1 General Commercial"—a designation that did not allow the operation of a slaughterhouse—BEM's slaughtering operation constituted a legal nonconforming use and thus was permitted under the zoning law in effect at the time. BEM's current owner, Kemper Durand, Jr., acquired the company and property in 2008.

About a year after Durand acquired the property, the slaughter operations increased in both volume and frequency. This led to a crescendo in complaints from the neighbors. In response to these complaints, the Village hired Vierbicher Associates, an engineering and land-use consulting firm, to investigate and report on the effects of the BEM facility. Vierbicher delivered its report to the Village on January 27, 2011. The report found that BEM's slaughter operation was responsible for "[i]ncreased truck traffic on local residential streets"; "[i]ncreased noise due to trucks and slaughter operations on the premises"; "[o]ffal runoff from the property that goes into storm sewers and adjacent properties"; "[f]lies and other vermin due to offal runoff and outdoor storage of animal waste that is not promptly removed from the property"; and "[a]nimals escaping from the property." The report concluded that BEM could "continue operation in its current location, but must do so within the constraints of Village ordinances. If further complaints are made to the Village and found to be of merit, abatement actions and/or fines may be in order."

Neighbors continued in 2012 to lodge the same kinds of complaints about the effects of BEM's slaughterhouse operations. And their complaints were heard: the Village President, Patrick Troge, wrote a letter to BEM warning that if the problems continued, the Village would take action, potentially including a nuisance abatement action or fines.

On May 2, 2012, a Red Angus steer escaped from BEM and was pursued by 12 BEM employees, one of them armed with a rifle, through the village. Three Dane County deputies eventually arrived on scene and cornered the animal. The showdown ended in a hail of gunfire; after the deputies

pumped six shotgun slugs, seven rounds from an M16, and three .22 rifle rounds into the steer, it fell dead in the streets of Black Earth. This was not the first renegade beast cut down in the Village: steers had escaped from BEM on two previous occasions since 2009. Each fugitive had occasioned a similar response, and met a similar end.

In the meantime, Durand was looking for new financing for BEM's operations. In 2013, after a search lasting more than a year, Durand approached the Bank of New Glarus. New Glarus agreed to loan BEM approximately $1.3 million. But the loan came with strings: BEM was required to raise $525,000 on its own, and to obtain a loan guarantee from the USDA's Office of Rural Development. The USDA guarantee would cover 80 percent of the loan amount. While he initially opposed the loan guarantee condition, Durand eventually acquiesced; he finalized the loan agreement in August 2013. The USDA provided New Glarus with a "conditional commitment," which would convert into the required loan guarantee upon the meeting of certain prerequisites. One of those prerequisites was a certification that there were "[n]o … suits … pending or threatened that would adversely affect the collateral when the security instruments are filed." Similarly, BEM was required to certify that "there are no actions, suits or proceedings pending or, to the knowledge of the [B]orrower/guarantors, threatened against the Borrower/guarantors that may result in any material adverse change in the business operations … of the Borrower/guarantors."

The complaints about BEM continued unabated throughout 2013. (Over the course of the year, BEM was the cause of 40 requests for police service.) On July 10, 2013, the Village

trustees met with the Village's attorney to discuss BEM's ordinance violations and potential zoning issues. At first, the trustees considered drafting or amending ordinances specifically addressed at BEM. They ultimately rejected this course of action out of concern about the propriety of addressing ordinances toward one specific business. Instead, they decided that the Village should do more to enforce the already-existing ordinances they believed BEM was violating. At the Village police committee meeting the following week, the trustees delivered their message to local law enforcement officials.

As a result of the increased enforcement, BEM received nine citations between October 1, 2013, and January 3, 2014. The citations had no effect on BEM's behavior, however, and the complaints continued. On December 10, 2013, the Village Board held a public meeting "regarding nuisance and zoning violations associated with Black Earth Meats." The agenda included time for remarks by law enforcement, the Village's building inspector, a BEM representative, and the public. The agenda also advised that the trustees would discuss and vote on a "strategy to be adopted by the [Village] with respect to litigation in which it is or likely to become involved regarding [BEM]." Notice of the meeting was published. Durand spoke on behalf of BEM. At the conclusion of the meeting, the trustees passed a motion giving BEM 120 days to present an acceptable plan for relocating its slaughter operation. If BEM failed to meet that deadline, it said, the Village would "take legal action to remove the slaughter operation."

Troge sent the promised notice to BEM the following day. His letter noted that BEM's slaughter operation had "increased to such a degree that it is now a much more intensive

commercial slaughtering operation" and had become a "nuisance." It directed BEM to relocate within a reasonable period and advised that if BEM failed to present an acceptable plan for doing so within 120 days, the Village "intend[ed] to commence legal action to abate the nuisance and secure a court order enjoining slaughter operations."

On December 23, 2013, BEM responded to Troge's letter with a notice of claim. The notice alleged that "as a direct result of the Village's Complaints, Citations, Resolutions and Statements," the USDA had refused to guarantee a loan from the Bank of New Glarus to BEM. It noted that without the guarantee, it might not be able to obtain the loan from New Glarus, which would in turn affect its financing. The Village denied the claim on January 7, 2014.

The Village then extended BEM's deadline for presenting its relocation plan. The plan was supposed to be presented at a Board meeting held on June 26, 2014, at the conclusion of the extended time period. Instead of the requested plan, however, BEM presented a consultant's report detailing four options for mitigating the problems its slaughtering created. Only one of those options involved relocating the operation to a new facility. The trustees took no action at the meeting.

The Board held another meeting one week later. Appearing as BEM's representative, Durand informed the trustees of the financing problems BEM had experienced because of the Board's December 10, 2013 motion. He explained that BEM needed the New Glarus loan to continue operating, and that if the Board did not pass another motion authorizing slaughter at the location, the loan would not be forthcoming. He asked the Board to pass a motion he had prepared. The proposed motion declared that slaughter was "permitted at the

[BEM] facility as a legal, nonconforming use"; that it "shall be permitted to continue"; and that BEM's "normal operation … is not a public nuisance." Troge advised Durand that the Board could not vote on Durand's motion until the Village's lawyer reviewed it. The plaintiffs, Durand and BEM, filed this lawsuit that day.

A week later, the Village held another meeting to discuss its "strategy … with respect to litigation" regarding BEM. Durand was present and was offered the chance to speak, but he declined. After the public portion of the meeting, the Board went into a closed session. When they returned, the trustees passed a motion "to authorize and direct the Village attorney to take necessary legal action to eliminate any public nuisance and complaints" regarding BEM. On July 21, 2014, the Bank of New Glarus told Durand that it would no longer offer him the previously discussed loan. Although the Bank did provide BEM short-term financing, BEM was forced to end its slaughter operations. By August 4, 2015, BEM had closed and listed its facility for sale.

BEM's lawsuit continued. At the end of discovery, the parties filed cross-motions for summary judgment. The district court granted summary judgment to the defendants on BEM's procedural due process and equal protection claims, dismissed BEM's takings claims as unripe, and remanded BEM's state-law claims to the Circuit Court for Dane County, Wisconsin. BEM timely appealed the district court's dismissal of its procedural due process and equal protection claims, to which we now turn.

## II

We review the district court's rulings on summary judgment *de novo. Advance Cable Co., LLC v. Cincinnati Ins. Co.*, 788 F.3d 743, 746 (7th Cir. 2015). Because the parties submitted cross-motions for summary judgment, we take the motions one at a time, construing all facts and drawing all reasonable inferences in favor of the non-moving party. *Id*. Summary judgment is appropriate when there is no dispute of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).

### A

Although our appellate jurisdiction is secure, we have noticed a question about the district court's jurisdiction that we must address. *Wisconsin Central, Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008) (internal citations omitted). It relates to the risk that BEM's procedural due process claims are not yet ripe, and if not, fall outside the permissible scope of the court's Article III power.

#### 1

Under *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), if a state provides adequate procedures for seeking just compensation, a property owner cannot state a takings claim in federal court until she has used these procedures and been denied just compensation. Wisconsin provides an inverse condemnation procedure by which a property owner may seek just compensation by initiating condemnation proceedings. See WIS. STAT. ANN. § 32.10. BEM has not availed itself of this procedure. If its procedural due process claims are takings claims, they are unripe.

We have construed *Williamson* broadly, holding that "[a] property owner may not avoid *Williamson* by applying the label '[procedural] due process' to the claim." *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000) (internal quotation mark omitted). There do exist *bona fide* non-takings claims "arising from land-use decisions" that "can be made independently from a takings claim and without being subject to *Williamson* ripeness." *Id*. at 370 (referring to equal protection claims). But labels are irrelevant: "[a] person contending that state or local regulation of the use of land has gone overboard must repair to state court." *Id*. at 368 (internal quotation mark omitted). The question is thus whether BEM's procedural due process claims are really takings claims in disguise—in this case, regulatory takings. If so, they are not ripe.

The parties do not dispute the existence of four interests protected by procedural due process: (1) a liberty interest in the occupation of slaughter; (2) a property interest in the non-conforming use; (3) the right to use the property for a slaughterhouse purpose; and (4) the plaintiff's interest in its financing agreement with New Glarus. Because the second and third give rise to archetypal takings claims, BEM's due process claims with regard to those interests are not ripe.

There is some question whether BEM's remaining claims are properly understood as takings claims. BEM's briefs can be read to suggest as much. With regard to the New Glarus financing and its liberty interest in the occupation of slaughter, BEM's claim is essentially that the Board achieved ends it could have obtained through zoning with the threat of litigation. Instead of rezoning the property and actually executing a taking, the Village threatened to sue. This was an action that, because of BEM's financing needs, indirectly deprived BEM

of financing and forced it to shut down. If the Village could have achieved the same result through an actual taking, the most logical response might be to see if a state court would construe it retroactively as a taking, provide or decline to provide compensation, and thereby provide all the process that was due. If BEM still had complaints when that process was over, it could then sue under 42 U.S.C. § 1983 and its claims would be ripe.

But BEM's financing agreement with New Glarus and its liberty interest in slaughter both represent interests independent of the property itself. We think that they may be properly construed as (non-takings) procedural due process claims, and therefore as ripe. We thus proceed to the merits.

2

In determining whether a deprivation of procedural due process has taken place, we ask two questions: first, whether the plaintiff has been deprived of a protected liberty or property interest; second, if so, whether the deprivation occurred without due process. *Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 589 F.3d 865, 870 (7th Cir. 2009). BEM has asserted two interests whose alleged deprivation, if protected, would support a claim: (1) a liberty interest in the occupation of slaughter, and (2) its interest in its financing agreement with New Glarus. The defendants do not dispute that these interests are cognizable under the due process clause of the Fourteenth Amendment. Instead, the parties disagree whether any action by the Village actually deprived BEM of those protected interests. BEM points to four events that it believes qualify as a deprivation: (1) the December 10, 2013 motion; (2) the December 11, 2013 letter; (3) the failure to adopt Durand's motion; and (4) the July 10, 2014 motion.

BEM's theory suffers from several fatal flaws. First, none of these actions was more than a threat of litigation—that is, notice that the Village intended to seek enforcement of its rights. Contrary to BEM's contention, nothing the Village did actually forbade slaughter, and in not passing Durand's motion, the Board merely declined to adopt his legal position. We are hard-pressed to imagine when notice itself can be considered a *deprivation* of due process, and this is certainly not such a case.

In *Hussein v. City of Perrysburg*, the Sixth Circuit held that where "a state official states his view that a citizen's actions are in violation of the law and threatens litigation, this is not a deprivation of the citizen's interest without notice and an opportunity to be heard." 617 F.3d 828, 832 (6th Cir. 2010). Instead, the official's statement is the "provision of notice." *Id*. The *ensuing litigation* is the opportunity to be heard. *Id*. Procedural due process does not "demand notice as a precondition of notice." *Id*. A contrary holding would "impose recursively impossible demands upon state officials who seek to enforce the law." *Id*.

We find this logic sound. In general, a threat to sue cannot qualify as a deprivation of procedural due process. If the actual abatement of a nuisance is not a deprivation of due process, mere notice that a governmental actor will pursue a nuisance action in an adversary proceeding cannot constitute a due process violation. See *Pierce v. Vill. of Divernon, Ill.*, 17 F.3d 1074, 1080 (7th Cir. 1994) (demolition of partially destroyed home pursuant to *ex parte* order not violation of due process where municipality gave owners "ample notice and opportunity to abate the nuisance").

To state a claim against a municipality under section 1983, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). There is no such direct causal link here. There were four steps between the Village's threat of litigation and all the deprivations except BEM's interest in its financing agreement with New Glarus. The purported deprivation of BEM's right to engage in slaughter was a result of the fact that BEM had to shut down. BEM shut down because (1) it needed financing; (2) the only financing it could get depended upon a guarantee; (3) USDA was the guarantor (and apparently no other guarantor was on the horizon); and (4) the USDA guarantee depended on BEM's not being subject to impending litigation. Even the loss of the loan from New Glarus depended on three intermediate causal steps: (1) the New Glarus agreement required a guarantee; (2) the USDA was the guarantor; and (3) the USDA guarantee depended on BEM's being free from impending litigation.

BEM argues that *Reed v. Village of Shorewood*, 704 F.2d 943, 949 (7th Cir. 1983), stands for the principle that "a municipality is responsible for the indirect results that flow from its direct actions." That overstates the case; indirect effects can ripple out quite a long way, and the law does not hold municipalities responsible for all of them. *Reed* in particular does not support the idea that a municipality is responsible for the kind of downstream effects alleged in this case. *Reed* held that even though the municipal defendant did not directly revoke the plaintiffs' liquor license, it could deprive them of it "through harassment of customers and employees and relentless, baseless prosecutions," thereby "destroy[ing] the value

of [their] licensed business and forc[ing] them ultimately to give up their Class A license." *Id*. Harassment and baseless prosecutions can be a direct cause of the loss of a liquor license; the threat of litigation and the loss of one loan may or may not lead to the decision to shut down a business. Moreover, *Reed*'s logic depended upon an analogy to regulatory takings, see *id.*, and that is not BEM's theory.

BEM points us to *Baer v. City of Wauwatosa*, 716 F.2d 1117 (7th Cir. 1983), but it is similarly inapposite. The municipality in *Baer* had a loophole that allowed gun shops to operate without a license. *Id*. at 1121–22. As a result, the municipality's revocation of the plaintiff's gun license did not cause him to lose his business. But the municipality then repealed the loophole and refused to issue the plaintiff a new license. Together, the municipality's three actions—revoking the license, repealing the loophole, and then refusing to issue a new license—directly deprived the plaintiff of his gun business. *Id*. Significantly, we held there that both the revocation and the repeal had to be wrongful for the plaintiff to state a procedural due process claim. *Id*. at 1121. BEM's citation to *Martinez v. California*, 444 U.S. 277, 284 (1980), which held that a parole officer who released a prisoner who killed someone five months later did not "deprive" the victim of life for Fourteenth Amendment purposes, is unhelpful to its cause; if anything, it supports the Village.

Finally, *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) represents an intriguing but ultimately faulty analogy. In *Backpage.com*, we held that Sheriff Dart's "campaign of starving [Backpage] by pressuring credit card companies to cut ties with its website" violated the First Amendment (not the Due Process Clause). *Id*. "The First Amendment," it noted,

"forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is compliance with his demands." *Id*. at 231. It is less clear that the Due Process Clause does so. The First Amendment is concerned with the chilling effect government action may have on speech; procedural due process is not. Moreover, in this case, the Village threatened only to litigate, not to impose sanctions solely within its power. And surely BEM does not contend that the Due Process Clause forbade the Village from suing to abate a nuisance; an actual lawsuit would have had the same effect on BEM's protected interests as the threat of one.

Even if the threat of litigation could in itself constitute a violation of due process and were a sufficiently direct cause of BEM's alleged deprivations, there is no reason to think that the process accorded to BEM was inadequate. Procedural due process generally requires only "notice and an opportunity to be heard." *Dusenbery v. United States*, 534 U.S. 161, 167 (2002) (internal quotation marks omitted). "Cities may elect to make zoning decisions through the political process ... with no hearings of any kind." *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 166 (7th Cir. 1994). Here, the Village did not even make a zoning decision. Even if it had, BEM received notice and a hearing at every turn. It received notice for every relevant Board meeting. Durand spoke at the December 10, 2013 meeting. Durand spoke at length in support of his motion at the July 2, 2014 meeting. Durand was given the opportunity to speak at the July 10, 2014 meeting; he declined to do so. The question arises what other process the Village could have provided before stating its intention to pursue enforcement of legal rights.

BEM's attempt to answer that question is largely nonsensical. The only additional process it identifies seems to be more specific notice. (It treats the December 10 and July 10 motions as notice; that concession disposes of any claims that these motions constituted an official deprivation.) It contends that the "language of the Motions do [*sic*] not inform" BEM "that they have an opportunity to object nor does it include any information relating to specifics of the plan that must be presented in order to avoid such 'legal action.'" It also contends that there was "no clear indication of what 'legal action' [would] be taken." But the record leaves no doubt that BEM knew it had the opportunity to object: it did so at several meetings. It presented alternate motions. And the Village stated clearly what legal action it intended to take: an action for nuisance abatement. Even if BEM had a protected right at stake, the process the Village used met constitutional standards.

B

BEM's last hurrah is a "class of one" equal protection claim. In order to proceed, it must show that it was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*per curiam*). BEM argues that where official action is motivated only by "sheer malice, vindictiveness, or malignant animosity," the victim states an equal protection claim and is not required to provide evidence of a better-treated comparator. *Fenje v. Feld*, 398 F.3d 620, 628 (7th Cir. 2005) (internal quotation marks omitted); *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000) (so-called "vindictive action" equal protection cases

require proof of "a totally illegitimate animus toward the plaintiff by the defendant").

The law on that point is up in the air, see *Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887 (7th Cir. 2012) (*en banc*), but we can assume for present purposes that BEM's position is correct. As the Supreme Court noted in *Olech*, "the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." 528 U.S. at 564 (internal quotation marks omitted). If a plaintiff can show that it was a victim of intentional and arbitrary discrimination through direct evidence, there is no reason it should be forced to jump through additional evidentiary hoops. See *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) ("If animus is readily obvious, it seems redundant to require that the plaintiff show disparate treatment in a near exact, one-to-one comparison to another individual.").

BEM's problem is that there is no evidence of animus in this case. While the Village trustees made no secret of their intent to force BEM to move its slaughterhouse operations (and were happy once it shut down), there is no evidence that they were motivated by malice or animosity. They were responding to a drumbeat of complaints from BEM's neighbors about increased traffic, delivery trucks blocking the road, livestock noise, foul odors, improper storage of animal parts, and offal runoff, blood, and animal waste in the streets. They responded more forcefully from 2011 onward to BEM than they had in the past because BEM's new owner significantly increased slaughter activities. In directing deputies to "feel free to write a citation" if they "s[aw] a violation," the trustees

were at most building a record in anticipation of a nuisance abatement suit.

As a result, although the Village pursued a campaign against continued slaughter activities by BEM at its current location, it had a rational basis for doing so. See *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012) (class-of-one equal protection claim requires that state actor has no rational basis for singling out plaintiff). It was BEM's burden "to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification." *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013) (citations omitted). It has failed to do so.

Lastly, BEM has not suggested a sufficiently similar comparator. It needed to find someone (or something) that shared with it all the principal, pertinent characteristics. *Swanson*, 719 F.3d at 784. BEM offers David W. Heiney's, a restaurant and bar, but Heiney's does not fit the bill. The tavern was not responsible for livestock noise, foul odors, improper storage of animal parts, and offal runoff, blood, and animal waste in the streets (let alone half-ton, horned desperadoes). There is no evidence that the Village received complaints from neighbors of Heiney's in any way similar to those it received about BEM. That provides an independent reason to reject the equal protection theory.

### III

The district court correctly granted summary judgment to the defendants on BEM's procedural due process and its equal protection claims. We therefore AFFIRM its judgment.