In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-3198

RICHARD WEBBER, as Special Administrator of the Estate of
Sara J. Schmidt,

*Plaintiff-Appellant,*

*v.*

ARMSLIST LLC and JONATHAN GIBBON,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:20-cv-01526-WCG — **William C. Griesbach**, *Judge.*

No. 21-3207

ERIN BAUER and ESTATE OF PAUL BAUER,

*Plaintiffs-Appellants,*

*v.*

ARMSLIST LLC and JONATHAN GIBBON,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:20-cv-00215-PP — **Pamela Pepper**, *Chief Judge.*

_____

ARGUED SEPTEMBER 13, 2022 — DECIDED JUNE 12, 2023
_____

Before FLAUM, BRENNAN, and SCUDDER, *Circuit Judges*.

BRENNAN, *Circuit Judge*. In these cases, we consider whether a website that hosts advertisements for the sale and purchase of firearms can be held liable under Wisconsin law for the deaths of two shooting victims. The circumstances giving rise to the complaints at issue are grave and the allegations are serious.

Erin Bauer and Richard Webber are the legal representatives and family members of two individuals killed using guns that had been listed on armslist.com, an online firearms marketplace. Bauer and Webber each sued Armslist LLC and its member manager, Jonathan Gibbon, in separate diversity actions, alleging negligence and other Wisconsin state law claims. The plaintiffs assert that the defendants designed the website to encourage and assist individuals in circumventing federal and state law regulating firearms. The defendants argue that the plaintiffs have failed to state a claim upon which relief can be granted because publishing third-party offers to sell firearms does not establish tort or other liability under Wisconsin law.

The district court dismissed the negligence claim in both cases, concluding that the plaintiffs failed to plausibly allege the website's design caused the deaths. The remaining claims were also dismissed, and in *Bauer*, Gibbon was dismissed from the lawsuit for lack of personal jurisdiction. Bauer seeks reversal of Gibbon's dismissal, and Armslist LLC challenges

the exercise of personal jurisdiction over Gibbon in *Webber*. At the heart of these appeals, Bauer and Webber also challenge the dismissal of their claims under Federal Rule of Civil Procedure 12(b)(6). The defendants ask us to affirm the dismissal of the plaintiffs' claims, either on the merits under Wisconsin law or as preempted by the Communications Decency Act (CDA), 47 U.S.C. § 230. The CDA precludes a website from being "treated" as the "publisher or speaker of any information provided by another information content provider." § 230(c)(1). We agree with the defendants that the district court lacked personal jurisdiction over Gibbon. We also affirm the district court's dismissal of the plaintiffs' negligence and other state law claims against Armslist LLC. Because we affirm on the state law claims, we decline to rule on the preemption issue.

We first describe the factual and procedural background of the cases. Then we address the exercise of personal jurisdiction over Gibbon, followed by the question of preemption by the CDA. Next, we review the plaintiffs' negligence claim, as well as their other state law claims. Finally, we consider the plaintiffs' requests to amend their complaints.[1]

---

[1] Armslist LLC argues that Illinois law should govern Bauer's claims. Although the company acknowledges that Wisconsin's choice-of-law rules require this court to analyze whether an outcome-determinative conflict exists between Wisconsin and Illinois law, *see State Farm Mut. Auto. Ins. Co. v. Gillette* , 641 N.W.2d 662, 675 (Wis. 2002); *Hunker v. Royal Indem. Co.*, 204 N.W.2d 897, 901 (Wis. 1973), it contends in a conclusory fashion that Bauer's allegations cannot state any claim under either state's law. Armslist LLC offers no arguments about the standard governing Bauer's claims under Illinois law and fails to engage with the district court's reasoning as to why Wisconsin law applies. We conclude that Armslist LLC has waived its challenge to the application of Wisconsin law. *See Cont'l W.*

**I. Background**

Under federal law, only licensed gun dealers may "engage in the business of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition." 18 U.S.C. § 923(a); *see also* § 922(a)(1).[2] Among other requirements, licensed dealers must contact the national instant criminal background check system prior to completing a transfer, verify the identity of any purchaser, and maintain records of importation, production, shipment, receipt, sale, or other disposition. § 922(t)(1); § 923(g)(1)(A); 27 C.F.R. § 478.124.

Under Wisconsin law, a firearms dealer, defined as "any person engaged in the business of importing, manufacturing or dealing in firearms and having a license as an importer, manufacturer or dealer issued by the federal government," is subject to similar requirements. WIS. STAT. § 175.35(1)(ar), (2). Private sellers may also sell firearms in Wisconsin consistent with state and federal law. *See* 18 U.S.C. §§ 921(a)(21)(C), 923(a); *Daniel v. Armslist, LLC*, 926 N.W.2d 710, 722 (Wis. 2019). A private seller is not engaged in the business of selling firearms as defined under federal and state law and therefore is not subject to the same requirements as firearms dealers. § 921(a)(21)(C); § 923(a); § 175.35(1)(ar), (2).

---

*Ins. Co. v. Country Mut. Ins. Co.*, 3 F.4th 308, 318 (7th Cir. 2021); *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

[2] Unless otherwise indicated, all federal and state statutory and regulatory citations are to the versions in effect at the time of the shootings and the purchases of the firearms.

### A. Factual

Armslist.com is an online marketplace for firearms. Defendants Armslist, LLC, a Pennsylvania limited liability company, and Jonathan Gibbon, a Pennsylvania resident, are the operator and member manager of armslist.com.[3] Armslist LLC is not engaged in the business of selling firearms. Rather, its website hosts "for sale" and "want to buy" ads posted by users.

Plaintiff Erin Bauer is the widow and executor of the estate of Paul Bauer and resides in Illinois. Thomas Caldwell, a private seller from Wisconsin, listed a Glock 26 9mm handgun for sale on armslist.com. That gun was purchased by Ron Jones from Milwaukee in 2017. According to Bauer's complaint, Jones resold that Glock handgun "into the broader criminal market where it ultimately was obtained" by Shomari Legghette. Legghette used the gun to shoot and kill Chicago Police Commander Paul Bauer on February 13, 2018, in downtown Chicago.

Plaintiff Richard Webber is the special administrator of the estate of his deceased daughter, Sara Schmidt, of Harrison, Wisconsin. She was the victim of domestic violence by her estranged husband, Robert Schmidt, who was arrested. A court prohibited him from possessing any firearms, but he purchased a gun on January 8, 2018 from a private party, Brock Verstagen, through armslist.com. Schmidt used the handgun to kill Sara and himself the next day.

---

[3] We use the title reflected in Jonathan Gibbon's affidavits in support of his motions to dismiss.

Webber sued Armslist LLC and Gibbon under diversity jurisdiction, alleging negligence and six other causes of action.[4] Bauer sued the same defendants, making the same claims and adding causes of action for aiding and abetting tortious conduct as well as loss of consortium.

The plaintiffs level serious accusations against the defendants. They allege that armslist.com allows individuals to engage in the business of selling firearms without a license and to circumvent federal and state law governing firearms dealers, including avoiding background checks. The defendants purportedly accomplished this through design and content features. Among these are choosing to label purchases and sales as private party transactions by default. The plaintiffs also claim that armslist.com allows users to filter listings to identify private party sellers. This "filter function" allegedly facilitates the private sale of firearms without background checks to individuals prohibited from possessing firearms.

The plaintiffs also contend the defendants provided certain assurances that enabled both buyers and sellers to operate anonymously, including that:

- "ARMSLIST DOES NOT become involved in transactions between parties and does not certify, investigate, or in any way guarantee the legal capacity of any party to transact";

- "ARMSLIST *can not* and *will not* be a party in transactions. It is the sole responsibility of the buyer and seller to conduct safe and legal transactions";

---

[4] Negligence per se, public nuisance, civil conspiracy, wrongful death, a survival action, and piercing the corporate veil.

- "You can perform all of the major functions without creating an account"; and

- Armslist will not contact a seller on behalf of a user or provide a user with information about another user but can provide this information to law enforcement during due process of law.

In addition to contending that the website's design is flawed, Bauer and Webber allege that Armslist LLC and Gibbon should have implemented certain design features, adopted by other online firearm marketplaces, to prevent illegal transactions. These include requiring evidence of the legality of the transactions, background checks and transaction records, delivery through federal firearms licensees, and a waiting period. They also include taking certain actions with respect to high volume sellers, allowing users to flag illegal conduct, and providing updated information on firearms laws.

**B. Procedural**

These two diversity cases proceeded before different district judges. Gibbon sought dismissal for lack of personal jurisdiction in both cases. In each case, both defendants moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaints for failure to state a claim.

In *Bauer*, the plaintiffs amended their complaint twice before the defendants moved to dismiss for lack of personal jurisdiction and failure to state a claim. The district court held a hearing at which it granted Gibbon's motion to dismiss for lack of personal jurisdiction. At the hearing, counsel in *Bauer* asked whether they could amend their complaint to remedy the personal jurisdiction issues. The court responded

affirmatively but advised the plaintiffs to wait to do so until after the court had ruled on Armslist LLC's motion to dismiss. After the hearing, the court granted Armslist LLC's motion to dismiss for failure to state a claim and entered judgment dismissing the case. The court ruled that Bauer sufficiently alleged duty, breach, and damages, but not causation.

Webber moved to transfer his case to federal court in Pennsylvania. But the Eastern District of Wisconsin court denied that motion. It also denied Gibbon's motion to dismiss for lack of personal jurisdiction and granted the defendants' motion to dismiss for failure to state a claim. The court found that Webber sufficiently alleged all elements of a negligence claim except causation. Judgment was entered dismissing the *Webber* case.

Armslist LLC and Gibbon further asserted in their motions to dismiss that § 230 of the CDA barred Bauer's and Webber's state law claims. The district court rejected the defendants' arguments, however. In *Webber*, the court concluded that the plaintiffs sought to hold Armslist LLC and Gibbon responsible for their own role in developing content, and that neither plaintiff sought to treat the defendants as the publisher or speaker of third-party content, which the CDA prohibits. *Bauer* reached the same conclusion. The court also dismissed the plaintiffs' remaining claims, including because failure to plead negligence was fatal to many of them.

## II. Personal Jurisdiction

We consider first whether the defendants waived their right to challenge the court's ruling in *Webber* that personal jurisdiction existed over Gibbon.

The plaintiffs argue a cross-appeal is necessary to reach this question, but we do not agree. A cross-appeal is required when a party seeks to modify the district court's judgment. *Wellpoint, Inc. v. Comm'r of Internal Revenue*, 599 F.3d 641, 649 (7th Cir. 2010). "The judgment is not the court's opinion or reasoning; it is the court's bottom line … ." *Id.* at 650. A cross-appeal permits an appellant "the same right to respond to his opponent's brief" and "alert[s] the court to the dual role of the parties in the appeal." *Id.*

Here, the judgment is the dismissal of the case and entry of final judgment. Dismissing the case for lack of personal jurisdiction would not modify that judgment. Additionally, Bauer already appealed the grant of Armslist LLC and Gibbon's motion to dismiss for lack of personal jurisdiction, so we are aware of this issue and the positions of the parties in both cases. Gibbon therefore has not waived his challenge on this point.

In *Bauer*, the district court concluded that it lacked personal jurisdiction over Gibbon. It reasoned that specific jurisdiction was absent because, although Armslist LLC's activities could be attributed to Gibbon, there was no indication that Gibbon or Armslist LLC targeted the forum state of Wisconsin.

But in *Webber* the court ruled differently, concluding that subsection (4)(a) of Wisconsin's long-arm statute for "[s]olicitation or service activities … carried on within" Wisconsin conferred jurisdiction over Gibbon. WIS. STAT. § 801.05(4)(a). Under the due process prong of the personal jurisdiction inquiry, the court reasoned that the complaint sought to hold Gibbon responsible for his role as a creator, designer, and administrator of armslist.com, and not merely because of his

corporate role. Because Gibbon was willing to serve and sell to customers in Wisconsin and collect the benefits flowing therefrom, the court found that personal jurisdiction existed over Gibbon.

Dismissal for lack of personal jurisdiction is reviewed de novo. *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 392 (7th Cir. 2020). Where there has been no evidentiary hearing, a plaintiff need only make a prima facie showing that the court has personal jurisdiction over the defendant. *Id.* at 392–93. Federal courts sitting in diversity must apply the personal jurisdiction rules of the forum state. *Kipp v. Ski Enter. Corp. of Wis., Inc.*, 783 F.3d 695, 697 (7th Cir. 2015). A federal court sitting in Wisconsin may exercise jurisdiction only if it comports with Wisconsin's long-arm statute, Wɪs. Stat. § 801.05, and Fourteenth Amendment due process. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012).

Two subsections of Wisconsin's long-arm statute have been argued or held to establish jurisdiction over Gibbon: Wisconsin Statute § 801.05(3) and (4)(a). Plaintiffs contend that specific jurisdiction over Gibbon exists under § 801.05(3), which provides that Wisconsin courts have personal jurisdiction in an action "claiming injury to person or property within or without this state arising out of an act or omission within this state by the defendant." In *Webber*, the court concluded that jurisdiction could be exercised under § 801.05(4)(a), which provides for jurisdiction in an action "claiming injury to person or property within this state arising out of an act or omission outside this state by the defendant, provided in addition that at the time of the injury…[s]olicitation or service activities were carried on within this state by or on behalf of the defendant."

Plaintiffs argue that Gibbon designed armslist.com to solicit business "in many states, including Wisconsin." By instituting design elements that permitted users to search for private sellers in Wisconsin, according to the plaintiffs, Gibbon subjected himself to personal jurisdiction in the forum.

In dispute is whether Armslist LLC's business in Wisconsin may be attributed to Gibbon by virtue of his corporate role for purposes of personal jurisdiction. Under Wisconsin law, showing that an officer has control over a corporation allows for attribution of the corporation's activities to that officer. Yet, a corporation's contacts with a forum must have existed by virtue of the officer's control.

In *Pavlic v. Woodrum*, 486 N.W.2d 533, 534 (Wis. Ct. App. 1992), Louis Woodrum solicited the plaintiff's investment in a corporation organized with his son Timothy. After the plaintiff agreed to invest, Timothy sent the stock certificates by mail to the plaintiff's Wisconsin address, and later sent a letter to the same address informing the plaintiff that the corporation had failed. *Id.* The plaintiff sued Timothy for damages in Wisconsin, arguing that personal jurisdiction could be exercised over him based on the sending of the stock certificate and letter. *See id.* at 534–35. The Wisconsin Court of Appeals held that Louis's and the corporation's contacts with Wisconsin could not be attributed to Timothy solely because of his role as an officer. *Id.* at 534. That court analyzed Timothy's contacts with the forum—the stock certificate and the letter—and held that these were insufficient to establish long-arm jurisdiction over Timothy for soliciting business in Wisconsin. *Id.* at 535. The court reasoned that Timothy could not have anticipated a financial benefit when he made the two mailings. *Id.* Rather, the mailing of the stock certificate was a

ministerial duty required because of Louis's contact, and the letter merely informed the plaintiff of dissolution. *See id.* That court then considered whether personal jurisdiction existed over Timothy under *State v. Advance Marketing Consultants, Inc.*, 225 N.W.2d 887 (Wis. 1975). *Pavlic*, 486 N.W.2d at 536.

In *Advance Marketing*, the Wisconsin Supreme Court concluded that "the placing of advertisements in newspapers circulated in Wisconsin" constituted an act or omission within the state from which the injury arose. 225 N.W.2d at 892. This activity was undertaken by virtue of the corporate officer's control of the corporation, as shown through trial testimony, and therefore could be attributed to him for purposes of exercising personal jurisdiction. *See id.* at 891–92. In *Pavlic*, the Wisconsin Court of Appeals explained that *Advance Marketing* could not be understood to conclude that an officer of a corporation who commits a personal tort—in those cases, involving fraud or misrepresentation—is always subject to personal jurisdiction. *See Pavlic*, 486 N.W.2d at 536. Rather, "[t]here must be some act or omission by that officer in Wisconsin to justify personal jurisdiction." *Id. Pavlic* explained that the "advertisements [in *Advance Marketing*] were circulated in Wisconsin by virtue of the officer's control" and therefore could be attributed to the officer. *Id.* Because Timothy had not acted in Wisconsin, *Advance Marketing* was not controlling. *Pavlic*, 486 N.W.2d at 536.

As in *Pavlic*, Gibbon's activities cannot be considered actions within Wisconsin for purposes of exercising personal jurisdiction over him. Plaintiffs have alleged that Gibbon designed armslist.com to permit it to be accessed "in many states, including Wisconsin." But they have failed to plead that in designing the website, Gibbon anticipated receiving a

financial benefit from users in Wisconsin because he made the decision to solicit business in that state. In other words, the plaintiffs do not allege that Gibbon was responsible for Armslist LLC's decision to target the forum. Instead, plaintiffs plead only that Gibbon "played a role in the design, architecture, and administration of Armslist.com" and "controls its operations." We decline to draw from these allegations the unsupported inference that Gibbon's "role" or "control" encompassed deciding that Armslist LLC would solicit business from Wisconsin.[5] Plaintiffs have therefore not alleged an act or omission occurring within the state or solicitation or service activities outside of the state by Gibbon that would bring him within the grasp of Wisconsin's long-arm statute.

Under this reasoning, the district court did not have personal jurisdiction over Gibbon.

### III. Communications Decency Act

The defendants argue in each case that the plaintiffs' state law claims are preempted by the Communications Decency Act (CDA), 47 U.S.C. § 230. The provision at issue states:

> **Protection for "Good Samaritan" blocking and screening of offensive material**
>
> **(1) Treatment of publisher or speaker**
>
> No provider or user of an interactive computer service shall be treated as the publisher or

---

[5] Gibbon describes his role as a "member manager," and Bauer suggests there may be additional "members" of Armslist LLC. This is an additional reason to be cautious to attribute Armslist LLC's decision to solicit business in Wisconsin to Gibbon given only a vague allegation that Gibbon "controls [Armslist LLC's] operations."

speaker of any information provided by another
information content provider.

§ 230(c)(1). Two terms in this statute are defined in § 230(f).
First, an "interactive computer service" is "any information
service, system, or *access software provider* that provides or en-
ables computer access by multiple users to a computer server,
including specifically a service or system that provides access
to the Internet and such systems operated or services offered
by libraries or educational institutions." § 230(f)(2) (emphasis
supplied). An "access software provider" is a provider of soft-
ware (including client or server software), or enabling tools
that do any one or more of the following:

> (A) filter, screen, allow, or disallow content;

> (B) pick, choose, analyze, or digest content; or

> (C) transmit, receive, display, forward, cache,
> search, subset, organize, reorganize, or translate
> content.

§ 230(f)(4). This court has previously considered websites
hosting third-party advertisements, like armslist.com, to fall
within the definition of "interactive computer service." *See
Chicago Laws.' Comm. for Civ. Rts. Under L., Inc. v. Craigslist,
Inc.*, 519 F.3d 666, 668, 671–72 (7th Cir. 2008) (treating the
online host of third-party housing advertisements as an inter-
active computer service). Second, § 230(f)(3) defines an "infor-
mation content provider" as "any person or entity that is
responsible, in whole or in part, for the creation or develop-
ment of information provided through the Internet or any
other interactive computer service."

   Whether the CDA preempts plaintiffs' state law claims is
a pure question of law that we review de novo. *See Talignani*

*v. United States*, 26 F.4th 379, 381 (7th Cir. 2022); *White v. United Airlines, Inc.*, 987 F.3d 616, 620 (7th Cir. 2021). As a federal court sitting in diversity, we are not bound by the decisions of state courts interpreting a federal statute.[6]

This court first examined § 230(c)(1) in *Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003). There, the plaintiffs sued corporations that provided web hosting services to websites that offered hidden camera videos of the plaintiffs for sale. *Id.* at 656. Others provided the video and website content, although the corporations may have provided "technical or artistic assistance in the creation and maintenance of" the websites. *Id.* at 657. This court proposed two potential readings of § 230(c)(1). *See id.* at 660. First, § 230(c)(1) might be read as a clause defining "provider or user" for immunity under § 230(c)(2). *Id.* Thus, if the objectionable information came from someone else, then the defendant would be eligible for immunity under § 230(c)(2); but if the defendant created the objectionable information, it would be a "publisher or speaker" of that content and fall outside of § 230(c)(2). *Id.* Second, § 230(c)(1) might preclude liability to the extent an internet service provider could be considered a "publisher" of

---

[6] In each case, the parties argue for the interpretations of the CDA by Wisconsin's appellate courts in *Daniel v. Armslist, LLC*, 913 N.W.2d 211 (Wis. Ct. App. 2018), *rev'd*, 926 N.W.2d 710 (Wis. 2019)—the plaintiffs for the ruling by the state appellate court, and the defendant for that by the state supreme court.

We apply Wisconsin substantive law as a court sitting in diversity, but that state's appellate decisions do not govern our interpretation of the federal CDA. *Cf. Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 198 (1988) (citations omitted) ("Although state law generally supplies the rules of decision in federal diversity cases, it does not control the resolution of issues governed by federal statute.").

another's content. *Id.* But the court did "not decide which understanding of § 230(c) is superior" because plaintiffs failed to plead any underlying state claim. *Id.*

In *Craigslist*, the Chicago Lawyers' Committee for Civil Rights Under Law sued Craigslist under the Fair Housing Act for allegedly discriminatory ads that were posted by third parties. 519 F.3d at 668. The Lawyers' Committee argued that Craigslist caused these ads "to be made, printed, or published" under 42 U.S.C. § 3604(c). *Craigslist*, 519 F.3d at 671. This court explained that § 230(c)(1) does not grant "comprehensive immunity from civil liability for content provided by a third party," illustrated by the liability of information content providers "for contributory infringement if their system is designed to help people steal music or other material in copyright." *Id.* at 670 (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005)). But we concluded that the only way Craigslist could be held liable under § 3604(c) was if it was treated as a publisher or speaker of advertisements authored by third parties, which § 230(c)(1) precluded. *See id.* at 671.

Later, in *City of Chicago v. Stubhub!, Inc.*, an internet auction site invoked the CDA in response to an action by the City of Chicago to collect and remit taxes for tickets sold. 624 F.3d 363, 364–65 (7th Cir. 2010). We held that § 230(c)(1) did not apply because the City did not seek to hold StubHub! liable as a publisher or speaker of information, such as through a defamation, obscenity, or copyright infringement suit. *See id.* at 366.

Five years later in *Backpage.com, LLC v. Dart*, this court considered whether a county sheriff violated the First Amendment by threatening credit card companies with criminal

prosecution as accomplices to illegal activity being advertised on an online forum. *See* 807 F.3d 229, 233–34 (7th Cir. 2015). This court referred to *Doe*, 347 F.3d at 659, in noting that under ordinary understandings of culpable assistance of wrongdoers, entities that know the information's content do not become liable for the poster's words. *Backpage*, 807 F.3d at 234. We therefore expressed doubt that the online forum could be held liable for aiding and abetting a crime just because they were aware that users had posted ads for illegal conduct. *See id.* We acknowledged, however, that the CDA did not immunize the online forum from federal criminal liability. *Id.*

Most recently, in *Huon v. Denton*, this court implicitly accepted the second of *Doe*'s descriptions of § 230(c)(1)'s effect: that the provision precludes liability whenever the cause of action treats an interactive computer service as the publisher of another's content. 841 F.3d 733, 741 (7th Cir. 2016) (describing that *Doe* "explain[ed] that 'entities that know the information's content do not become liable for the sponsor's deeds,' and not[ed] that § 230(c) preempts contrary state law" (quoting *Doe*, 347 F.3d at 658–59)). In *Huon*, this court reversed dismissal of a defamation claim where the plaintiff plausibly alleged that employees of the defendant website "helped create and develop" some of the allegedly defamatory comments. *Id.* at 736–37. We explained that "for purposes of defamation and other related theories of liability, a company … cannot be considered the publisher of information simply because the company hosts an online forum for third-party users to submit comments." *Id.* at 741. But the CDA does not preclude liability against companies "for creating and posting, inducing another to post, or otherwise actively participating in the posting of" content. *Id.* at 742.

These precedents show that § 230(c)(1) is not a comprehensive grant of immunity for third-party content. Instead, that subsection precludes liability only where the success of the underlying claims requires the defendant to be considered a publisher or speaker of that content. But § 230(c)(1) may not necessarily preclude liability if the underlying claims identify the interactive computer service's own content as objectionable.

Plaintiffs argue their claims are based on content Armslist LLC created to allegedly encourage and assist prohibited third parties to engage in illegal firearms transactions. To Webber and Bauer, armslist.com enables anyone to identify themselves as a "Private Party." The website also applies that phrase to all advertisements created by users without an account. Both complaints further allege that Armslist LLC created content that informed users that the company does not become involved in transactions or certify, investigate, or guarantee the legal capacity of any party to transact. According to the plaintiffs, these features enabled individuals to circumvent federal and state firearms laws.

Armslist LLC responds that the plaintiffs seek to impose upon it a duty of care to protect others from harm that arises from publication of third-party advertisements on armslist.com. The plaintiffs' theory, in Armslist LLC's view, is that prohibited possessors and sellers used armslist.com to advertise illegal gun transactions. According to Armslist LLC, any state cause of action for failing to prevent illegal transactions treats Armslist LLC as a publisher of third-party advertisements. Along the same line, Armslist LLC submits that the decision to create a listing with the private-party label was ultimately the user's decision.

Our analysis is aided by this court's discussion in *Craigslist* about the interaction between § 230(c)(1) and contributory copyright infringement suits. 519 F.3d at 670. Plaintiffs' allegations that armslist.com was designed to encourage and assist individuals to engage in illegal gun sales and purchases are similar to the allegations that the software products of Grokster, Ltd. and StreamCast Networks, Inc. were designed to encourage the illegal obtaining of music or other copyrighted material. *See Grokster*, 545 U.S. at 918–19, 936–37. We explained in *Craigslist* that § 230(c)(1)'s limited role meant that the cause of action in *Grokster* would not necessarily be precluded because § 230(c)(1) is not a grant of comprehensive immunity for content provided by a third party. *Craigslist*, 519 F.3d at 670. Even so, we need to decide whether § 230(c)(1) precludes the plaintiffs' claims only if they have stated a cause of action against Armslist LLC. *See Doe*, 347 F.3d at 660. We therefore assess those claims.

## IV. Negligence

We next address whether the plaintiffs have plausibly pleaded common law negligence claims against Armslist LLC. As in our personal jurisdiction analysis, the substantive law of the forum state controls, *Erie R.R. Co. v. Tompkins*, 204 U.S. 64, 78 (1938), here, Wisconsin tort law. If the Wisconsin Supreme Court has not yet addressed an issue before us, we look to the decisions of the Wisconsin Court of Appeals to predict that state's law. *In re Zimmer, NexGen Knee Implant Prods. Liab. Litig.*, 884 F.3d 746, 751 (7th Cir. 2018).

To the extent a conflict exists between the state and federal pleading standards, *see Cattau v. Nat'l Ins. Servs. of Wis.*, 926 N.W.2d 756, 758–59 (Wis. 2019), we apply the federal pleading standard to assess the sufficiency of the allegations on a

motion to dismiss. *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670–72 (7th Cir. 2008). "To survive a motion to dismiss, a plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 365–66 (7th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## A. Wisconsin common law of negligence, including public policy factors

A negligence claim under Wisconsin law consists of four elements: duty, breach, causation, and damages. *See Brenner v. Amerisure Mut. Ins. Co.*, 893 N.W.2d 193, 198 (Wis. 2017) (citing *Gritzner v. Michael R.*, 611 N.W.2d 906, 912 (Wis. 2000)). Armslist LLC does not dispute that damages have been alleged. Among the other three elements, we focus on the third, causation.

Legal cause under Wisconsin law has two components: cause-in-fact and public policy factors. *See Fandrey ex rel. Connell v. Am. Fam. Mut. Ins. Co.*, 680 N.W.2d 345, 351–52 (Wis. 2004); *see also* Wis. JI-CIVIL 1500 cmt. Cause-in-fact is established using the "substantial factor" test. *Fandrey*, 680 N.W.2d at 351. The public policy factors address whether the cause of the harm is legally sufficient to permit recovery. *See id.* at 353. In other words, under Wisconsin law, "[p]roximate cause involves public policy considerations for the court," although the term "proximate cause" is no longer used. *Id.* at 352–53.

The six public policy factors Wisconsin courts consider when deciding whether to limit liability are: (1) "[T]he injury is too remote from the negligence"; (2) "Recovery is 'too "wholly out of proportion to the culpability of the negligent tort-feasor"'"; (3) "[I]n retrospect it appears too highly extraordinary that the negligence should have brought about the harm"; (4) "Allowing recovery 'would place too unreasonable a burden upon [the tortfeasor]'"; (5) "Allowing recovery would be 'too likely to open the way to fraudulent claims'"; or (6) "Allowing recovery 'would "enter a field that has no sensible or just stopping point."'" *Id.* at 348 n.1 (quoting *Colla v. Mandella*, 85 N.W.2d 345, 348 (Wis. 1957)). Because these factors are set out in the disjunctive, a finding that one is satisfied is sufficient to preclude liability. *See Tobias v. Cnty. of Racine*, 507 N.W.2d 340, 342 (Wis. Ct. App. 1993).

The application of these public policy factors is a question of law. *Fandrey*, 680 N.W.2d at 350. The Wisconsin Supreme Court has emphasized that when courts limit liability as part of the legal cause analysis, they are not pronouncing on "what is politically appropriate for the state as a whole." *Id.* at 354. Rather, they are engaged in an analysis that is "inexorably tied to legal cause in Wisconsin," *id.* at 354, and is "a function of the court." *Stephenson v. Universal Metrics, Inc.*, 641 N.W.2d 158, 168–69 (Wis. 2002). But that function must be exercised with due respect for legislative choices expressed in its enactments. *See Hoida, Inc. v. M & I Midstate Bank*, 717 N.W.2d 17, 33–34 (Wis. 2006); *Smaxwell v. Bayard*, 682 N.W.2d 923, 941, 941 n.15 (Wis. 2004); *Stephenson*, 641 N.W.2d at 168–69.

In conducting the public policy analysis, Wisconsin courts have tread carefully when it comes to subject matters that are "highly regulated by the legislature." *Stephenson*, 641 N.W.2d

at 170. On those topics, the Wisconsin Supreme Court has expressed a particular reluctance "to create liability where the legislature has not expressed that there should be any." *Id.* That court has sometimes addressed the relevance of legislative enactments under the sixth public policy factor; on other occasions, it has considered certain statutes apart from its discussion of the relevant factors. *Compare Smaxwell*, 682 N.W.2d at 939–42 *and Nichols v. Progressive N. Ins. Co.*, 746 N.W.2d 220, 229–31 (Wis. 2008), *with Hoida*, 717 N.W.2d at 33–35.

The Wisconsin Supreme Court has expressed that "the better practice is to submit the case to the jury before determining whether the public policy considerations preclude liability." *Alvarado v. Sersch*, 662 N.W.2d 350, 355 (Wis. 2003). But it has also stated that a court may apply public policy considerations before trial where the policy questions are fully presented and the facts are easily ascertainable. *Fandrey*, 680 N.W.2d at 358; *see Hornback v. Archdiocese of Milwaukee*, 752 N.W.2d 862, 875–76 (Wis. 2008).

Plaintiffs contend the district court in *Webber* erred in addressing the public policy factors at the motion to dismiss stage because the facts are insufficiently established. But the public policy factors have previously been applied on motions to dismiss. *See, e.g.*, *Nichols*, 746 N.W.2d at 222–23, 227. Important to our consideration is that the relevant public policy to be applied in these cases stems from legislative enactments. The parties acknowledge that Armslist LLC does not sell firearms, let alone engage in the business of selling firearms, so the interpretation and application of statutes to these cases does not require full development of the facts. Moreover, the pleadings and briefing present a question of public policy. *See Bowen v. Lumbermens Mut. Cas. Co.*, 517 N.W.2d

432, 443 (Wis. 1994). That question is whether it contravenes statutes for a website hosting firearms transactions to be held to the standards regulating firearms dealers in Wisconsin, or to charge such a website with enforcing those standards. The parties submitted substantial briefing addressing the first, second, fourth, and sixth public policy factors, and the scope of Wisconsin statutes regulating firearms transactions appears on the face of the complaints. For these reasons, the public policy factors are appropriately considered in resolving these cases at the motion to dismiss stage.

### B. Wisconsin statute on purchase of handguns

The key legislative enactment guiding our discussion is Wisconsin Statute § 175.35, which regulates the purchase of handguns. That statute defines "firearms dealer" as "any person engaged in the business of importing, manufacturing or dealing in firearms and having a license as an importer, manufacturer or dealer issued by the federal government." § 175.35(1)(ar). By referring to the federal licensing scheme, the state statute incorporates certain definitions provided under federal law. First, a "licensed dealer" is "any dealer who is licensed under the provisions of this chapter," and a "dealer" includes "any person engaged in the business of selling firearms at wholesale or retail." 18 U.S.C. § 921(a)(11). The term "engaged in the business," however, "shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." § 921(a)(21)(C). Therefore, the provisions of § 175.35 governing firearms dealers exclude individuals making occasional sales and exchanges—that is, private sellers. Wisconsin law compels firearms dealers to obtain evidence of

the legality of the transaction, conduct background checks, and keep transaction records, among other requirements. *See* § 175.35. To aid our evaluation, we consider these statutory demands on firearms dealers.

*Evidence of transaction's legality.* Before transferring possession of a handgun, a firearms dealer must, among other things, obtain identification and a completed notification form from a transferee. § 175.35(2)(a)–(b). Section 175.35(2g)(a) specifies, "The department of justice shall promulgate rules prescribing procedures for a transferee to provide and a firearms dealer to inspect identification containing a photograph of the transferee." The Wisconsin State Department of Justice promulgated Wisconsin Administrative Code § Jus. 10.01, which declared the purpose of the chapter to be "to establish the procedures, as required under s. 175.35(2g), Stats., for searching the records of persons to whom a handgun dealer proposes to transfer a handgun."[7] Section Jus. 10.06(1)(a) states that a dealer "shall require each handgun transferee to show the dealer, for the dealer's inspection, a reliable identification document. The identification document shall include a photograph of the transferee." A dealer must also "require each transferee to complete an official notification form obtained from the department," which collects information including a transferee's legal name, birth date, gender, race, social security number, and current address. § Jus. 10.06(1)(c)(1). This information is then used to

---

[7] "Handgun dealer" or "dealer" as used in the chapter refers to "a firearms dealer as defined in s. 175.35(1)(ar), Stats., who offers one or more handguns for sale." WIS. ADMIN. CODE § Jus. 10.03.

certify the legality of a handgun transfer. *See generally* § Jus. 10.06(1)(d)–(2).

*Background Checks and Transaction Records.* Before transferring a handgun, a firearms dealer must also request a "firearms restrictions record search." WIS. STAT. § 175.35(2)(c). That includes "a search in the national instant criminal background check system." § 175.35(at). Further, a firearms dealer must keep "the original record of all completed notification forms and a record of all confirmation numbers and corresponding approval or nonapproval numbers." § 175.35(2j); *see also* WIS. ADMIN. CODE § Jus. 10.10(1).

*Delivery and Waiting Period.* Wisconsin Statute § 175.35 does not require purchasers of firearms from private sellers to take delivery in any specific way, nor does it impose a waiting period on the delivery of a firearm to the purchaser after a confirmation number from a firearms restrictions record search is obtained, *see Daniel*, 926 N.W.2d at 722. Moreover, Wisconsin Statute § 66.0409 governs the local regulation of weapons. That statute specifies "[n]othing in this section prohibits a political subdivision from continuing to *enforce until November 30, 1998*, an ordinance or resolution that is in effect on November 18, 1995, and that requires a waiting period of not more than 7 days for the purchase of a handgun." § 66.0409(am) (emphasis added).

### C. Plaintiffs' negligence allegations

The allegations of Armslist LLC's negligence track the same three categories:

*1. Evidence of Legality.* Bauer and Webber contend Armslist LLC breached its duty by failing to require buyers and sellers to provide information about the legality of transactions.

They specifically allege that Armslist LLC failed to demand greater transparency from users, such as by requiring both buyers and sellers to create accounts and provide credit-card verified evidence of their identities. They also aver Armslist LLC failed to oblige buyers and sellers to certify and provide evidence that they are legal transactors. Bauer adds that Armslist LLC was negligent in failing to require buyers and sellers to register.

*2. Background Checks and Transaction Records*. Bauer and Webber further allege that Armslist LLC breached its duty by failing to require or recommend that sellers conduct background checks. Webber adds that Armslist was negligent in failing to require or recommend that sellers create transaction records.

*3. Delivery and Waiting Period.* Bauer and Webber also claim that Armslist LLC was negligent in failing to require purchasers from private sellers to take delivery of the firearm through a federal firearms licensee, who would run a background check and create transaction records. Webber further alleges that Armslist LLC was negligent in failing to impose a reasonable waiting period for delivery of a firearm purchased through the website.

As shown above, Wisconsin Statute § 175.35 regulates each of these aspects of handgun sales. Concluding that the allegations in these three categories state a negligence claim would directly contravene the Wisconsin legislature's judgments, as reflected in Wisconsin Statute §§ 175.35 and 66.0409.

Section 175.35 requires firearms dealers—not websites, private sellers, or other entities—to obtain certain evidence of the legality of a transaction, the first category. Armslist LLC

is not a firearms dealer. Concluding that the allegations in this first category can proceed would impose the responsibilities of firearms dealers on actors which the Wisconsin legislature has not chosen to regulate in this manner. It would also hold Armslist LLC liable for failing to operate as an arm of the state where Wisconsin has not given it this function. Just so, on allegations about background checks and transaction records—the second category—the Wisconsin legislature has not chosen to regulate websites or private sellers, such as Verstagen, or to oblige them with enforcement.

Under § 175.35, neither a method of delivery nor a waiting period is specified—the third category—even for firearms dealers. That statute also incorporates the federal definition in 18 U.S.C. § 921 of "engaged in the business" of dealing in firearms, which expressly exempts private sellers from its requirements. Therefore, the Wisconsin legislature has chosen not to impose delivery specifications on handguns obtained via private sale, the third category. Nor has it imposed a waiting period on transactions. In fact, a forty-eight-hour waiting period that formerly existed under Wisconsin law was eliminated in later versions of § 175.35. *See* Act of June 24, 2015, § 3, 2015 Wis. Legis. Serv. 22 (West) (eliminating a minimum waiting period of forty-eight hours).

Armslist LLC is not a firearms dealer—rather, it operates a website that hosts third-party advertisements for the sale and purchase of firearms. The state has not entrusted it with enforcing the provisions of the regulatory scheme governing handgun transfers. It follows that Armslist LLC has no statutory obligation to collect identification, require certification and evidence of legal transactions, mandate or recommend background checks or recordkeeping, or regulate

the delivery of firearms. If we decided that plaintiffs stated a negligence claim against Armslist LLC based on these three categories of allegations, that conclusion would contravene the Wisconsin legislature's judgment on which entities—i.e., firearms dealers—will be held liable for meeting the requirements of state and federal law. Wisconsin has not chosen to include websites hosting firearms transactions as among the actors regulated in the ways plaintiffs allege, a decision that must be respected. Wisconsin has also chosen to exempt private sellers, like Verstagen, from certain requirements, WIS. STAT. § 175.35(1)(ar), and has made the decision to eliminate a waiting period on handgun purchases, *see* Act of June 24, 2015, § 3, 2015 Wis. Legis. Serv. 22 (West). We decline to redefine what is politically appropriate for the state or to find liability where Wisconsin has not expressed it should exist. *See Hoida*, 717 N.W.2d at 27; *Stephenson*, 641 N.W.2d at 170. Just so, we note that state officials can take measures to ensure that this regulatory scheme, enacted by elected representatives, is complied with so its requirements do not become a "dead letter."

Although most of plaintiffs' allegations fall into these three categories and are in unmistakable tension with Wisconsin's legislative enactments, we see three sets of allegations that are not:

- *High Volume Sellers.* Bauer alleges Armslist LLC was negligent in failing to: monitor high volume sellers, design its website to prevent unlawful high volume sales, remove sellers engaged in the business of selling firearms without a license, provide users with tools to report repeat offenders, notify law enforcement of users engaged in the business of selling

firearms, and inform users that law enforcement will be notified of persons who appear to be engaged in selling firearms without a license.

- *Flagging Illegal Conduct.* Plaintiffs also claim Armslist LLC was negligent in failing to enable users to flag potentially illegal conduct and alert it and law enforcement of this activity.

- *Providing Updated Firearms Law.* Bauer and Webber aver Armslist LLC breached its duty by failing to provide "extensive and regularly updated" information regarding all applicable firearms laws.

We consider next whether plaintiffs have plausibly pleaded causation in any of these three sets of allegations.

"The phrase 'substantial factor' denotes that the defendant's conduct has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense." *Merco Distrib. Corp. v. Com. Police Alarm Co.*, 267 N.W.2d 652, 654 (Wis. 1978) (citing Restatement (Second) of Torts § 431, cmt. a (1965)). Under Wisconsin law, causation is not restricted to a single act or omission: "[T]here can be more than one substantial factor contributing to the same result and thus more than one cause-in-fact." *Morgan v. Pa. Gen. Ins. Co.*, 275 N.W.2d 660, 666 (Wis. 1979). Causation is a factual question for a jury if reasonable people "could differ on the issue." *Id.* It becomes a question of law if reasonable people "could not disagree." *Id.*

"Cause-in-fact has also been described as requiring an unbroken sequence of events connecting the negligent act and the injury." *Hoida*, 717 N.W.2d at 33 n.19; *see also Cefalu v. Cont'l W. Ins. Co.*, 703 N.W.2d 743, 747 (Wis. App. 2005);

*Fondell v. Lucky Stores, Inc.*, 270 N.W.2d 205, 210 (Wis. 1978). In other words, the defendant's negligence must be "actively operating at the time of the accident which produced the plaintiff's injury." *Cefalu*, 703 N.W.2d at 747.

Bauer's high-volume seller claim fails due to a break in the chain of causation. Even if we assume Bauer's high volume seller allegations adequately plead duty and breach, Bauer does not plead any facts that demonstrate Jones was prohibited by law from purchasing firearms. Rather, Bauer alleges only that Jones had been previously arrested on drug charges; Bauer does not claim that Jones had been charged with any crime that would have precluded him from lawfully obtaining a firearm. What is more, Bauer pleads only that Jones "may have feared" he would be unable to pass a background check, as opposed to alleging that a background check would have affirmatively prevented him from buying a gun. Private sales are legal in Wisconsin, *see* 18 U.S.C. § 921(a)(21)(C); *Daniel*, 926 N.W.2d at 722, and Bauer has not alleged that Jones unlawfully obtained the firearm at issue. Reasonable people could not disagree that Bauer failed to plead that Armslist LLC's alleged negligence was actively operating when Jones obtained the firearm. *See Cefalu*, 703 N.W.2d at 747. Bauer thus has not alleged causation as a matter of law in a high-volume seller claim.

We reach the same conclusion as to the other two sets of allegations. Causation is not established where the harm would have occurred even absent the defendant's negligence. *See Beacon Bowl, Inc. v. Wis. Elec. Power Co.*, 501 N.W.2d 788, 807 (Wis. 1993). Bauer and Webber have failed to plausibly plead that the deaths would not have occurred but for Armslist LLC's failure to permit users to flag illegal conduct. In

fact, in its website's terms of use, Armslist LLC provided the contact information number for the Bureau of Alcohol, Tobacco, Firearms and Explosives. Given that users could report the same conduct directly to ATF, plaintiffs do not explain how allowing users to flag conduct would plausibly have prevented the deaths.

Plaintiffs have also failed to plausibly allege that the deaths would not have occurred but for Armslist's failure to provide updated firearms laws. Bauer and Webber do not allege any facts about the effect of providing updated firearms information on the likelihood that individuals will engage in illegal transactions. Without these allegations, we cannot conclude that plaintiffs have plausibly alleged providing updated firearms laws would have prevented the deaths.

Even if we assume the duty and breach elements of negligence have been satisfied, these three additional sets of allegations, not precluded by Wisconsin Statute § 175.35, do not survive the plausibility standard necessary to plead a negligence claim. None of these allegations plead factual content that allows the court to draw the reasonable inference that the defendants are liable for the misconduct alleged. *See Boucher*, 880 F.3d at 365–66. Put another way, the allegations in any of these three sets do not plausibly show that Armlist LLC caused the deaths of Commander Bauer and Sara Schmidt.

### D. Application of public policy factors

As noted above, in addition to cause-in-fact, Wisconsin law on causation includes public policy considerations. *Fandrey*, 680 N.W.2d at 352; *see also* Wis. JI-CIVIL 1500 cmt. As an alternative causation analysis, we consider plaintiffs' allegations under two of the public policy factors, the second

(disproportionate liability) and the sixth (no sensible or just stopping point).

In *Webber*, the district court ruled that the plaintiff's negligence claim was precluded, including by the second policy factor of disproportionate liability. He concluded that imposing civil liability here would likely destroy Armslist LLC's business. In *Bauer*, the district court declined to base its decision on the public policy factors.

*Out of proportion to culpability.* Bauer and Webber argue that Wisconsin courts have invoked this public policy factor only when the defendant's blameworthiness is minimal at the time the risk materializes, or if it is more than minimal, the cost of injury is so high that it is out of proportion with the defendant's culpability. Among the cases plaintiffs cite for this proposition is *Stephenson*.

Armslist LLC counters that because it did not use, distribute, or sell a firearm to anyone, holding it responsible for the murders would be disproportionate to its culpability. It also refers to *Daniel* and argues that creating and operating a website that enables buyers to find information posted by third-party sellers is legal.

In *Stephenson*, the Wisconsin Supreme Court concluded that recovery was precluded on this factor against an individual who agreed to drive an inebriated person home, causing a bartender to serve that person more alcohol. 641 N.W.2d at 160, 169. It reasoned, in relevant part, that liability was disproportionate considering the state's immunity laws. If the defendant had been a social host who had served alcohol to the defendant, he would be immune from suit. "It defies common sense to hold someone in [the defendant]'s position

liable while immunizing someone who serves or even encourages alcohol consumption." *Id.* at 169.

Based on *Stephenson*, this second factor precludes liability in *Webber* on all allegations within the three categories referred to above. As in that case, statutes inform culpability. Private sellers are exempt from the requirements plaintiffs seek to impose. Verstagen is a private seller, and thus has no obligation to certify, investigate, or delay the transaction. To impose those requirements on Armslist LLC, the website hosting Verstagen's transaction, would place liability on an actor one step removed from Verstagen, and circumvent legislative judgment. *See id.* For these reasons, we agree with the district court's analysis and conclusion on this second factor in *Webber*.

*No sensible or just stopping point.* Under the sixth public policy factor, Armslist LLC contends that because plaintiffs will always conjure creative arguments about what a firearms platform should have done to prevent harm, liability here has no sensible or just stopping point. Armslist LLC argues that potential harm is not limited to firearms and could apply to any product that could harm someone. Plaintiffs respond there is no liability if a defendant played no role in a harm, but here the defendants consciously created, designed, and maintained a website to allow and encourage illegal firearms sales. Per plaintiffs, the stopping point would be a jury's decision that Armslist LLC acted reasonably.

At the end of its discussion of this sixth factor in *Stephenson*, the Wisconsin Supreme Court stated that "the possibilities for expanding liability … would also threaten to run counter to the legislative enactments regarding immunity." 641 N.W.2d at 170. That court continued, "Finally, we give

significant weight to the fact that the production, sale, distribution, vending, and consumption of alcoholic beverages are highly regulated by the legislature." *Id.* "Given this history and the current state of the law, we are reluctant to create liability where the legislature has not expressed that there should be any. We think that it is more appropriate that the legislature decide whether or not someone who agrees to drive an intoxicated person home should be an exception to the legislature's general policy of holding the intoxicated persons themselves liable for injuries they cause." *Id.*

In *Smaxwell*, the same court ruled that the sixth factor precluded liability against a landowner for harm caused by a tenant's dogs. 682 N.W.2d at 939. This was in part because allowing liability would contradict a state statute imposing strict liability exclusively on owners for injuries caused by dogs. *Id.* at 941.

Under the reasoning of *Stephenson* and *Smaxwell*, this sixth factor precludes liability in *Webber* and *Bauer*. The same concerns exist with expanding liability counter to legislative enactments on the purchase of handguns. Wisconsin statutes regulate the entities that qualify as firearms dealers; other actors are not subject to those statutes and have not been charged with enforcing them. To allow liability on those other actors, such as private sellers—and here a website—would contradict that legislative judgment. The same holds true for the lack of a principled stopping point. If liability is permitted here, there would be no distinction between firearms dealers and exempt entities, a line Wisconsin law has drawn.

Because the public policy factors are considered in the disjunctive, a finding that one is satisfied is sufficient to preclude liability. *See Tobias*, 507 N.W.2d at 342. Most of the allegations

in *Webber* fail under the second factor, and the first three categories of allegations in both cases fail under the sixth factor.

\*       \*       \*

Concluding that plaintiffs' allegations would state causation for a negligence claim would directly contravene Wisconsin statutes on the regulation of handguns. The remaining allegations do not state a claim under Wisconsin tort law, so we need not review the questions of duty and breach. Two of Wisconsin's public policy factors also preclude plaintiffs' claims. For these reasons, we conclude that plaintiffs have not stated common law negligence claims against Armslist LLC.

## V. Other Claims

Plaintiffs argue the district court erroneously dismissed their public nuisance, wrongful death, survivorship, and consortium claims. But their failure to plausibly plead negligence claims disposes of these other causes of action.

Public nuisance requires a showing of negligence. WIS. JI-CIVIL 1928 ("To sustain a claim of nuisance in this case, plaintiff must prove … [that the] defendant was negligent."). Wrongful death actions in Wisconsin require an underlying wrongful act, neglect, or default. WIS. STAT. § 895.03 (providing that liability exists "[w]henever the death of a person shall be caused by a wrongful act, neglect or default"); *see also Rosenthal v. Ascension Health*, No. 21-cv-344-wmc, 2022 WL 203475, at \*2 (W.D. Wis. Jan. 24, 2022) (stating that § 895.03 "is a 'derivative tort action[]' and thus, specifically premised on the existence of an underlying common law tort" (quoting *Christ v. Exxon Mobil Corp.*, 866 N.W.2d 602, 609 (Wis. 2015))). Similarly, the survival action depends on an underlying tort, since the "action is brought by the representative of the

deceased for personal injury damages suffered by the deceased prior to his death." *Force ex rel. Welcenbach v. Am. Fam. Mut. Ins. Co.*, 850 N.W.2d 866, 878 n. 30 (Wis. 2014) (quoting *Prunty v. Schwantes*, 162 N.W.2d 34, 37 (Wis. 1968)). Loss of consortium is also a derivative claim, relying on the existence of an underlying tort—here, negligence. *Cf. Finnegan ex rel. Skoglind v. Wis. Patients Comp. Fund*, 666 N.W.2d 797, 804–05 (Wis. 2003) (characterizing consortium as a derivative claim). Because plaintiffs cannot show negligence, there is no underlying tort for these claims, and their dismissal was proper.

Two more claims, unrelated to any alleged negligence by Armslist LLC, require discussion: aiding and abetting tortious conduct (only pleaded in *Bauer*), and civil conspiracy.

The district court held that Bauer failed to state a claim for aiding and abetting tortious conduct because he did not sufficiently allege that defendants consciously desired or intended to assist illegal sales. Bauer argues on appeal that she pleaded that defendants deliberately chose to implement certain design features and that they designed and administered armslist.com to assist illegal purchases.

"A person is liable in tort for aiding and abetting if the person (1) undertakes conduct that as a matter of objective fact aids another in the commission of an unlawful act; and (2) consciously desires or intends that his conduct will yield such assistance." *Tensfeldt v. Haberman*, 768 N.W.2d 641, 649 n.12 (Wis. 2009). "Mere presence, with no effort to prevent unlawful conduct, is not aiding and abetting unless an intent to assist is communicated." *See Winslow v. Brown*, 371 N.W.2d 417, 423 (Wis. 1985). The underlying tortious conduct alleged by Bauer is the "transferring [of] weapons to dangerous individuals displaying a propensity to misuse such weapons in a

manner that would cause harm to innocent third-parties." As an allegation of intent to aid this conduct, Bauer points to his claim that "the Armslist Defendants chose to implement design, policy and content choices which made the transfer of firearms to the criminal market an inevitable and major part of the commerce on Armslist.com." Bauer also refers to his allegation that despite notice of criminal activity, "the Armslist Defendants continued to design and administer Armslist.com to fuel an online black market in firearms."

Bauer's allegations do not raise a plausible inference that Armslist LLC aided and abetted illegal sales. At most, he pleads facts consistent with both an intent to aid and abet and mere presence, and Armslist LLC's actions are more likely explained by the latter. *See Iqbal*, 556 U.S. at 680. The fact that private sales are legal in Wisconsin provides an obvious alternative explanation for armslist.com's design. Bauer also fails to point to a specific action Armslist LLC took in "continuing" to design and administer the website to promote illegal sales that might indicate an intent to assist; rather, Bauer seems to contend that armslist.com aided and abetted illegal transactions simply by virtue of its continued existence. But the failure to prevent unlawful conduct is alone insufficient to state a claim for aiding and abetting. *See Winslow*, 371 N.W.2d at 423.

Mere presence can support aiding and abetting liability if an intent to assist is communicated. *Id.* As evidence of such a communication, Bauer asserts Armslist included the following disclosures on its website:

- "ARMSLIST DOES NOT become involved in transactions between parties and does not certify,

> investigate, or in any way guarantee the legal capacity of any party to transact"; and

- "ARMSLIST *can not* and *will not* be a party in transactions. It is the sole responsibility of the buyer and seller to conduct safe and legal transactions."

But the plaintiffs' interpretation of these disclaimers presents only a sheer possibility of unlawful conduct. *See Iqbal*, 556 U.S. at 678. The obvious alternative explanation for the disclaimers is that they operate as "at your own risk" provisions. These provisions no more endorse illegal activity than a "swim at your own risk" sign placed at a hotel pool endorses using the pool to drown another. In fact, armslist.com's terms of use require users to certify that they "will not use Armslist.com for any illegal purpose." Bauer's claim for aiding and abetting tortious conduct therefore fails.

In each case the district court also dismissed plaintiffs' civil conspiracy claims. In *Webber*, the court reasoned that the claim suffered from the same failure to adequately plead causation and was subject to the same public policy considerations as apply to the negligence claim. And in *Bauer*, the court concluded that the allegations were too vague to state a claim, since plaintiffs alleged that Gibbon and Armslist "and/or other parties" conspired. That court also observed that the complaint alleged only in a conclusory fashion that Armslist LLC intended to conspire to promote unlawful transactions.

Plaintiffs contend that Armslist LLC and co-conspirators intended to supply firearms to prohibited possessors. They allege they did so by encouraging the operation of "stores" through which unlicensed firearms dealers would sell firearms, and by motivating prohibited possessors to transact on

the website through its design features. Bauer also argues that Armslist LLC conspired with Gibbon and other unknown parties. Armslist LLC responds that the allegations of civil conspiracy are too vague to state a claim.

To support a claim for civil conspiracy, "[t]here must be intentional participation in the transaction with a view to the furtherance of the common design." *Coopman v. State Farm Fire & Cas. Co.*, 508 N.W.2d 610, 613 (Wis. Ct. App. 1993). "[M]ere knowledge, acquiescence or approval of a plan, without cooperation or agreement to cooperate, is not enough to make a person a party to a conspiracy." *Id.* (quoting *Winslow*, 371 N.W.2d at 420)). Plaintiffs plead facts consistent with cooperation in furtherance of an unlawful purpose, but they are also compatible—and more readily explained by—mere acquiescence. As explained above, an obvious alternative explanation for Armslist LLC's conduct is that it designed its website to permit private sales consistent with Wisconsin law. The plaintiffs have therefore failed to move their complaints over the line from conceivable to plausible. *Iqbal*, 556 U.S. at 680.[8]

---

[8] For completeness, we note two items. First, because plaintiffs have not plausibly alleged a cause of action, we need not resolve the CDA preemption issue. *See Gonzalez v. Google LLC*, 143 S. Ct. 1191 (2023). Second, plaintiffs' claims of piercing the corporate veil were properly dismissed. Armslist LLC is a Pennsylvania limited liability company. We apply Wisconsin's choice-of-law rules to determine whether Wisconsin or Pennsylvania law on piercing the corporate veil applies. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under Wisconsin's conflict of laws rules, "the threshold question for a court is 'whether a genuine conflict exists between Wisconsin law and the law of the other state.'" *Waranka v. Wadena Ins. Co.*, 847 N.W.2d 324, 332 (Wis. 2014) (quoting *Sharp ex rel. Gordon v. Case Corp.*, 595 N.W.2d 380, 384 (1999)). Wisconsin law applies

### VI. Amending the Complaints

Last, Bauer and Webber argue that the district court erred in entering judgment instead of dismissing their complaints and permitting amendment. They ask us to remand with instructions to allow them to file amended complaints, if we deem amendment necessary.

These two cases have somewhat different procedural postures. When the district court entered judgment in each case, Bauer had twice amended her original complaint, and Webber was standing on his original complaint.[9]

"When a district court enters final judgment at the same time as it dismisses a complaint, the plaintiff should file a post-judgment motion for leave to amend under Federal Rule of Civil Procedure 59(e)." *White v. Ill. State Police*, 15 F.4th 801, 808 (7th Cir. 2021). "We have rejected the argument that Rule 15 requires a district court dismissing a plaintiff's original complaint with prejudice to *sua sponte* grant leave to amend the complaint. Even after judgment is entered, a plaintiff seeking to amend a complaint must properly move to amend in the district court." *Id*. (citations omitted).

---

when there is no conflict between the two states' laws. *Sharp*, 595 N.W.2d at 384. A request to pierce the corporate veil is not an independent cause of action under Wisconsin and Pennsylvania law. *Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1035 (Pa. 2018); *see Spearing v. Cnty. of Bayfield*, 394 N.W.2d 761, 765 (Wis. Ct. App. 1986). Therefore, there is no conflict, Wisconsin law applies, and the plaintiffs have failed to state a claim.

[9] Plaintiffs have filed comprehensive complaints. Bauer's second amended complaint is 48 pages, with 233 paragraphs, and includes nine counts. Webber's complaint is 36 pages, with 227 paragraphs, and includes seven counts.

"Ordinarily … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." *Runnion v. Girl Scouts of Greater Chi.*, 786 F.3d 510, 519 (7th Cir. 2015). But decisions in which this court has remanded to permit amendment where no motion under Federal Rules of Civil Procedure 59 or 60 was filed after the entry of judgment are rare.[10]

When judgment was entered in Bauer's case, she had already amended her complaint twice. Although the district court suggested that Bauer would have an opportunity to amend her complaint after the ruling on the Rule 12(b)(6) motion, Bauer chose to appeal the judgment rather than move to reopen the pleadings. Webber made the same decision. Neither plaintiff attempted to file an amended complaint in the district court after the judgment or propose to this court how they would amend their complaints if given the opportunity. Plaintiffs chose to appeal. Accordingly, we decline plaintiffs' requests to remand for amendment.

## VII. Conclusion

For these reasons, we REVERSE the decision in *Webber* that personal jurisdiction exists over Gibbon. Because plaintiffs have failed to state a claim upon which relief can be granted, we AFFIRM the dismissal in each case.

---

[10] One decision that appears to have been remanded to permit amendment without a Rule 59 or 60 motion is *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682 (7th Cir. 2004). But there, the district court expressly found that amendment would be futile, *id.* at 686, making such a motion frivolous.